WISCONSIN BELL, INC., (d/b/a Ameritech Wisconsin), a Wisconsin corporation, Petitioner-Respondent-Cross-Appellant,†

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent-Appellant-Cross-Respondent,

SPRINT TELECOMMUNICATIONS, INC., Excel Telecommunications, Inc., and AT&T Communications of Wisconsin L.P., Co-Appellants-Cross-Respondents.

Court of Appeals

*No. 02–3163. Oral argument October 7, 2003.—*
*Decided December 23, 2003.*

2004 WI App 8

(Also reported in 675 N.W.2d 242.)

† Petition to review granted 4-20-04.

410

411

On behalf of the respondent-appellant-cross-respondent, the cause was submitted on the briefs of *Diane M. Ramthun* and *Steven Levine*, assistant general counsels of The Public Service Commission of Wisconsin.

On behalf of the co-appellants-cross-respondent, the cause was submitted on the combined briefs of *Peter L. Gardon, Stephen J. Liccione,* and *Ryan J. Owens* of

*Reinhart, Boerner, Van Deuren, S.C.*, of Madison, Wisconsin, and *Arthur J. LeVasseur* of *Fischer, Franklin & Ford*, of Detroit, Michigan.

On behalf of the petitioner-respondent-cross-appellant, the cause was submitted on the briefs of *Linda M. Clifford, Jennifer L. Peterson* of *LaFollette, Godfrey & Kahn*, of Madison.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. SCHUDSON, J. The Public Service Commission of Wisconsin, Sprint Telecommunications, Inc., Excel Telecommunications, Inc., and AT&T Communications of Wisconsin, L.P., appeal from the circuit court order reversing the Commission's order granting Sprint's, Excel's, and AT&T's request for a revenue refund from Wisconsin Bell, Inc., d/b/a Ameritech Wisconsin (n/k/a "SBC Wisconsin"; referred to as "Ameritech" in this opinion). The court concluded that while the Commission had correctly determined that the Ameritech long-distance charges that had generated that revenue were unlawful, the requested refund was foreclosed by WIS. STAT. § 196.37(2) (2001–02).[1] Ameritech cross-appeals from the same circuit court order affirming the Commission's determination that the underlying long-distance charges were unlawful.

¶ 2. We conclude that the circuit court correctly affirmed the Commission's determination that the Ameritech charges were unlawful. We also conclude, however, that the court incorrectly reversed the Commission's order granting the requested refund of the unlawful revenue. Accordingly, on the appeal we reverse, and on the cross-appeal we affirm.

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

## I. BACKGROUND

### A. Introduction

¶ 3. To say that the factual background can seem complicated is like saying that pasta can be filling. Reviewing the record, reading the briefs, and listening to oral argument, the author of this opinion often felt like the hungry but uncertain traveler who, sitting down to indulge in fine Italian cuisine for the first time, loosens his belt but wonders whether he must untangle the linguini before eating it.

¶ 4. Fortunately, however, our digestion is eased because the parties at least agree on most of what happened here. In the cross-appeal, for example, the Commission responds that, in general, it "takes no issue with the background and statement of facts set forth by Ameritech," even adding that much of Ameritech's summary serves as "an exhaustive and helpful explanation for the court of a complex area of telecommunications regulation." Thus, in our effort to accurately state the technical aspects of this case, we rely heavily on the parties' presentations and, in our effort to clarify, we set aside many of the acronym-loaded details choking this case.

¶ 5. In the last decade or so, few Americans have escaped the chaotic, consumer-unfriendly complications spawned by the deregulation of the telecommunications industry. As many companies compete to satisfy consumers and produce profits, they struggle to sort out the remaining rules and regulations, as well as new ones. Navigating their way with considerable uncertainty, the industry and government have formulated

various price-setting and regulatory approaches.[2] The issues in this appeal and cross-appeal come from Wisconsin's approach.

¶ 6. Specifically, the parties' primary dispute derives from their differing understandings of what constitutes compliance with Wis. Stat. § 196.196(2)(b)3, which provides: "After eliminating intrastate carrier common line charges, the telecommunications utility may not reinstate an intrastate carrier common line charge or a substitute charge." In this case, therefore, the primary issue is whether the "presubscribed interexchange carrier charge" (PICC) Ameritech charged was a prohibited "substitute" for the former "carrier common line charge" (CCLC).

## B. Access Charges

¶ 7. On July 5, 1994, the Wisconsin legislature enacted 1993 Wisconsin Act 496, which included Wis. Stat. § 196.196, titled, "Telecommunications utility price regulation." 1993 Wis. Act 496, § 76. That statute, in part, allows telecommunications companies the option of accepting a modified form of pricing known as "price cap regulation." Ameritech elected this option on September 1, 1994—the statute's effective date—and, by doing so, accepted various restrictions, including limitations on "access" charges.

¶ 8. Access charges are the charges telecommunications carriers and, derivatively, their customers pay the primary local telephone company to tap into its network for long distance calling service. *See* Wis. Stat.

---

[2] For a recent summary effectively describing some of the economic considerations at play among competing telecommunications companies, see *AT&T Communications of Ill., Inc. v. Illinois Bell Tel. Co.*, 349 F.3d 402, 404–07 (7th Cir. 2003).

§ 196.01(1b).[3] In this case, the local exchange carriers are Sprint, Excel, and AT&T; the company providing the network is Ameritech.[4]

¶ 9. Access charges on long distance calls from one state *to another* are "*inter*state access charges," and are regulated by the Federal Communications Commission. *See MCI Telecomms. Corp. v. State*, 203 Wis. 2d 392, 397, 553 N.W.2d 284 (Ct. App. 1996) ("The Federal Communications Commission has exclusive regulatory jurisdiction over interstate telecommunications."), *aff'd,* 209 Wis. 2d 310, 562 N.W.2d 594 (1997). Access charges on long distance calls within one state are "*intra*state access charges," and are regulated by state laws. *See id.* at 398 (The Commission "regulates the intrastate activities of telecommunications utilities in Wisconsin."). In a practice known as "mirroring," states may set *intra*state access charges based on *inter*state access charges. Wisconsin does so, with exceptions, under WIS. STAT. § 196.196(2)(b).[5] That *intra*state access rate, part of which consists of the "carrier common

---

[3] WISCONSIN STAT. § 196.01(1b) defines "access service" as "the provision of switched or dedicated access to a local exchange network for the purpose of enabling a telecommunications provider to originate or terminate telecommunications service."

[4] Technically, Sprint, Excel, and AT&T are "competitive local exchange carriers" and Ameritech is the "incumbent local exchange carrier." *See Wisconsin Bell, Inc. v. Public Serv. Comm'n*, 2003 WI App 193, ¶¶ 2–3, 267 Wis. 2d 193, 670 N.W.2d 97.

[5] WISCONSIN STAT. § 196.196(2)(b) provides:

1. Intrastate access service rates of a price-regulated telecommunications utility with more than 150,000 access lines in use in this state may not exceed the utility's interstate rates for similar access services. The telecommunications utility shall eliminate 50% of its intrastate carrier common line charge within one year

line charge" (CCLC), *see* WIS. STAT. § 196.196(2)(b)1, is, according to the parties, "at the core of this case." But what, exactly, surrounds that core? To identify that, we need to understand what Ameritech did following the Federal Communications Commission's revision of the interstate access charge rate structure.

¶ 10. Ameritech, having elected to operate under "price cap regulation," was required, by WIS. STAT. § 196.196(2)(b)2, to "eliminate intrastate carrier common line charges," and was prohibited, under § 196.196(2)(b)3, from "reinstat[ing] an intrastate carrier common line charge or a substitute charge." Ameritech complied by eliminating the intrastate carrier common line charges, denominated as such. But in 1997, the FCC revised the interstate access charge rate structure and created the "presubscribed interexchange carrier charge" (PICC). Ameritech explains:

> Among other things, the FCC's new access charge rate structure eliminated the previous CCLC and created a new rate element, the presubscribed interexchange carrier charge ("PICC"). Under Act 496's concept of mirroring, a question arose: How could [Ameritech] "mirror" the new federal access charge rate structure while preserving the state-required elimination of the old CCLC?

---

after its election to become price regulated and shall eliminate the balance of its intrastate carrier common line charge within one year thereafter.

2. A price-regulated telecommunications utility with more than 150,000 access lines in use in this state shall eliminate intrastate carrier common line charges upon full authorization to provide interlata service.

3. After eliminating intrastate carrier common line charges, the telecommunications utility may not reinstate an intrastate carrier common line charge or a substitute charge.

417

Ameritech answers that it "chose the only logical option: It mirrored the new federal rate structure but, on the *intra*state side, it lowered one rate element—the PICC—to account for the forgone CCLC revenues." *Ameritech* maintains that its "implementation of the PICC in its *intra*state rate structure" did not violate § 196.196(2)(b)3.

¶ 11. The Commission disagreed. In its November 16, 2001 decision, the Commission concluded that Ameritech's assessment of the federal PICC constituted a prohibited "substitute charge" for the carrier common line charge, under WIS. STAT. § 196.196(2)(b)3. The Commission ordered Ameritech to refund the approximate $18,000,000 it had collected through the PICC charges during the previous four years.

¶ 12. Ameritech gained judicial review under WIS. STAT. ch. 227 and, on August 27, 2002, the circuit court affirmed the Commission's conclusion that Ameritech had assessed an unlawful "substitute charge," thus leading to Ameritech's cross-appeal. The court, however, reversed the Commission's refund order, thus leading to the appeal by the Commission and Sprint, Excel, and AT&T, the companies to which the refunds would have been paid.

¶ 13. Did the Commission reasonably conclude that Ameritech's implementation of the PICC in its intrastate rate structure amounted to a substitute charge for the carrier common line charge? And, if so, did the Commission correctly order Ameritech to refund the revenue generated by the PICC?

## II. AMERITECH'S CROSS-APPEAL

¶ 14. Logically, we begin with the cross-appeal. If we agree with Ameritech's argument that the Commission erred in concluding that the challenged long-

distance charges were unlawful, the issue of the appeal —whether the law forecloses a revenue refund— evaporates. If not, we go on to decide the appeal in order to determine whether, contrary to the circuit court's conclusion, the Commission correctly ordered the refund.

¶ 15. We start, therefore, by considering whether the Commission correctly determined that Ameritech, "[a]fter eliminating intrastate carrier common line charges," *see* WIS. STAT. § 196.196(2)(b)3, violated the statute by "reinstat[ing] . . . a substitute charge," *see id.*, through its implementation of the federal PICC.[6] Our consideration requires review of the Commission's interpretation of what constitutes a "substitute charge" under § 196.196(2)(b)3, and its application of that statute to the facts of this case.

---

[6] We should clarify that Ameritech's approach, at least initially, was not surreptitious. In 1997, approximately sixteen months after it was statutorily required to eliminate its carrier common line charges, Ameritech filed for an exception tariff to implement an intrastate PICC. Ameritech advised the Commission that its requested tariff did not "in any manner constitute a substitute for a Carrier Common Line Charge." AT&T filed a complaint objecting to Ameritech's requested tariff. After reviewing the supporting documentation Ameritech provided, Commission staff responded "that Ameritech's PICC tariff does not need modification or withdrawal." That staff determination was not appealed.

In 1998, Ameritech amended its tariff to correct what it said was a typographical error. In the process, however, it also increased its intrastate PICC rate. MCI and AT&T filed complaints with the Commission challenging Ameritech's PICC rate, leading to the hearing and decision underlying this appeal and cross-appeal.

## A. Standard of Review

¶ 16. We review the decision of the Commission, not that of the circuit court. *Richland Sch. Dist. v. DILHR*, 166 Wis. 2d 262, 273, 479 N.W.2d 579 (Ct. App. 1991). In this case, the parties vigorously debate the degree of deference due the Commission's determination. Ameritech argues that because this regulatory scheme was a relatively new one, and because the Commission had not previously addressed the question of what constitutes a "substitute charge," the Commission's decision is due no deference. The Commission responds, however, that although the precise statutory question is novel, the regulatory framework is not; that because it has had extensive experience interpreting and applying the rules regulating the telecommunications industry, its determination should be given great weight. The Commission is correct.

¶ 17. An agency's application of a statute to a particular set of facts is due great-weight deference if: (1) the legislature has given the agency the duty to administer the statute; (2) the agency's interpretation is one of long-standing; (3) the agency employed its expertise or specialized knowledge in interpreting and applying the statute; and (4) the agency's interpretation will provide uniformity and consistency in applying the statute. *Citizens' Util. Bd. v. Public Serv. Comm'n*, 211 Wis. 2d 537, 550–51, 565 N.W.2d 554 (Ct. App. 1997). Here, clearly, the first, third and fourth criteria are satisfied; only the "long-standing" criterion causes us pause. The case law suggests, however, that that "long-standing" language, standing alone, may be a bit misleading.

¶ 18. To determine whether great-weight deference is due, the test "is not . . . whether the commission has ruled on the precise—or even substantially similar —facts in prior cases." *Barron Elec. Coop. v. Public Serv. Comm'n*, 212 Wis. 2d 752, 764, 569 N.W.2d 726 (Ct. App. 1997). Were that required, in cases involving the Public Service Commission, great-weight deference "would indeed be a rarity." *Id.* Thus, in this case, because the Commission was called upon to consider a novel situation created by the exact manner in which Ameritech had dealt with the federal PICC, its interpretation, perforce, could not be "of long-standing." *See Citizens' Util. Bd.*, 211 Wis. 2d at 551–52. But certainly the mere fact that a regulated company may devise a new pricing method must not automatically reduce the deference due the regulating agency. After all, it is an agency's experience with related rules and similar circumstances that equips it to evaluate new facts and evolving regulatory systems.

¶ 19. If any doubt on this point remained, we erased it, explaining, in *Citizens' Utilities Bd.*, that although the Commission's determination was "unique to [that] case, the agency's practice and methods of evaluating" issues of a similar nature were of "longstanding," thus supporting great-weight deference. *Id.* at 552. *See also Virginia Sur. Co. v. LIRC*, 2002 WI App 277, ¶ 13, 258 Wis. 2d 665, 654 N.W.2d 306 ("[A]lthough the Commission has never decided a case presenting the precise facts raised by this appeal, that is not a prerequisite to giving the agency great-weight deference."), *review denied*, 2003 WI 16, 259 Wis. 2d 102, 657 N.W.2d 707 (Feb. 19, 2003) (No. 02–0031); *William Wrigley Jr., Co. v. DOR*, 176 Wis. 2d 795, 801, 500 N.W.2d 667 (1993).

¶ 20. "[T]he key in determining what, if any, deference courts are to pay to an administrative agency's interpretation of a statute is the agency's experience in administering the particular statutory scheme." *Barron Elec. Coop.*, 212 Wis. 2d at 764. Here, as the Commission points out, its experience is extensive. Both before and after deregulation, the Commission has been responsible for regulating the telecommunications industry in Wisconsin. To carry out its responsibility, the Commission, for many years, has utilized its expertise and specialized knowledge. Since 1984, when Ameritech was created following AT&T's breakup, the Commission has administered the system of access charges. And since 1993, the Commission has administered the provisions of ch. 196 governing competitive practices.

¶ 21. Moreover, the legislature, with the enactment of ch. 196, granted the Commission extensive authority to address the details of what, exactly, constitutes "a reasonable and just charge" for telecommunications services. *See* WIS. STAT. § 196.03(6).[7] Here and

---

[7] WISCONSIN STAT. § 196.03(6) provides:

In determining a reasonably adequate telecommunications service or a reasonable and just charge for that telecommunications service, the commission shall consider at least the following factors in determining what is reasonable and just, reasonably adequate, convenient and necessary or in the public interest:

(a) Promotion and preservation of competition consistent with ch. 133 [Trusts and Monopolies] and s. 196.219 [Protection of telecommunications consumers].

(b) Promotion of consumer choice.

(c) Impact on the quality of life for the public, including privacy considerations.

(d) Promotion of universal service.

elsewhere in the chapter, *see, e.g.,* WIS. STAT. §§ 196.195, 196.199, and 196.219, the delegation of fact-finding authority and discretionary decision making to the Commission is evident.

¶ 22. The legislature, having paved the regulatory road, and having granted the Commission extensive authority to utilize its experience and expertise in finding facts and applying the statutes, certainly did not want that authority undermined by courts re-routing the traffic. We, after all, are not unlike many consumers who encounter difficulties deciphering their own phone bills. Without being facetious, we can be humble enough, in a case like this one, to respect that an agency, far better than a court, has the experience, expertise, and fact-finding opportunity that allow for fair and consistent decision making in areas of complex regulation. *Brown v. LIRC,* 2003 WI 142, ¶¶ 13, 19, 267 Wis. 2d 31, 671 N.W.2d 279 ("The appropriate level of scrutiny . . . depends on the comparative institutional capabilities and qualifications of the court and the agency to make a legal determination on a particular issue."). The Commission, no doubt, will be presented with many new questions as consumers and the telecommunications industry travel their new road. In these circumstances, it simply would make no sense to accord anything less than great-weight deference.[8]

(e) Promotion of economic development, including telecommunications infrastructure deployment.

(f) Promotion of efficiency and productivity.

(g) Promotion of telecommunications services in geographical areas with diverse income or racial populations.

[8] No doubt, equally complex determinations have led courts, traditionally, to accord great-weight deference in the

## B. Analysis

¶ 23. Giving great-weight deference to the Commission's determination, we must affirm if the decision was reasonable; and we must do so even if, in our estimation, an alternative interpretation may be equally or even more reasonable. *Barron Elec. Coop.*, 212 Wis. 2d at 761. "The agency's decision may be set aside by a reviewing court only when, upon an examination of the entire record, the evidence, including the inferences therefrom, is such that a reasonable person, acting reasonably, could not have reached the decision from the evidence and its inferences." *Sterlingworth Condo. Ass'n v. DNR*, 205 Wis. 2d 710, 727, 556 N.W.2d 791 (Ct. App. 1996) (citation omitted). Here, while conceding that some of Ameritech's theories "are reasonable and might be persuasive . . . at the agency level," the Commission correctly contends that they do not trump the evidence supporting its conclusion that the PICC, as implemented by Ameritech, constituted a substitute for the CCLC.

---

area of utility rates. *See, e.g., Wisconsin End-User Gas Ass'n v. Public Serv. Comm'n*, 218 Wis. 2d 558, 561–62, 581 N.W.2d 556 (Ct. App. 1998) (noting that court owes great deference to agency in matters of statutory interpretation and rate setting but concluding *de novo* review was required for contract interpretation); *Barron Elec. Coop. v. Public Serv. Comm'n*, 212 Wis. 2d 752, 764–66, 569 N.W.2d 726 (Ct. App. 1997) (concluding that agency's experience and expertise merit great-weight deference); *MCI Telecomms. Corp. v. State*, 203 Wis. 2d 392, 403, 553 N.W.2d 284 (Ct. App. 1996) (concluding that agency's interpretation of statute governing assessment of utilities for payment of regulatory costs is due great-weight deference); *City of Brookfield v. Milwaukee Metro. Sewerage Dist.*, 141 Wis. 2d 10, 14–16, 414 N.W.2d 308 (Ct. App. 1987) (concluding that agency's special expertise merits deference).

¶ 24. Evidence established that the PICC is a rate element assessed against carriers for access services. An Ameritech witness, J. Thomas O'Brien, testified that Ameritech's implementation of the PICC was a rate recovery mechanism related to Ameritech's access service costs. He confirmed, therefore, that, quite understandably, the PICC charge "appears under the carrier common line section in [Ameritech's] tariff."

¶ 25. Lending further support to the Commission's conclusion, evidence also established that Ameritech implemented the PICC based on common line revenues formerly associated with the CCLC charges and, therefore, that Ameritech's mirroring of the interstate PICC at the intrastate rate constituted a substitute charge. For example, Dennis L. Ricca, an Excel witness, explained: "This is shown in every PICC filing made with the FCC to date by Ameritech. Ameritech's . . . filing in its Description and Justification makes clear that every penny of the revenue requirement for the interstate PICC in Wisconsin is made up of common line costs." He concluded, therefore, that Ameritech's PICC was "clearly a substitute for the carrier common line charge."

¶ 26. The Commission agreed. *See Sterlingworth Condo. Ass'n*, 205 Wis. 2d at 727 (Commission is responsible for determining credibility of witnesses and weight of evidence). The Commission found that "Ameritech's intrastate PICC is a flat carrier common line charge or substitute carrier common line charge." The Commission concluded that both the PICC and CCLC were designed to recover common line costs and simply did so in different ways—CCLC on a minutes-of-use basis; PICC on a per-line flat charge basis. Either way, the Commission explained, the charges collected "access revenue through what was meant to be non-

recoverable carrier common line charges in Wisconsin." Thus, the Commission concluded that Ameritech, in implementing the PICC in an apparent attempt to mirror an interstate common line rate element at the intrastate level, had sought to generate revenue and gain competitive advantage in a manner prohibited by WIS. STAT. § 196.196(2)(b)3.

¶ 27. Clearly, based on the evidence, the Commission could reasonably reach that conclusion. In fact, much of what at first might seem to be in controversy is beyond dispute. Ameritech does not deny that the PICC is a rate element designed to recover costs associated with the common line. Indeed, Ameritech's own tariff describes its PICC as a flat monthly charge applied to each end user's common line. And Ameritech does not dispute that it must not implement the PICC as a method to recover revenues it agreed to relinquish by opting into price cap regulation.

¶ 28. Ameritech maintains, however, that the Commission failed to recognize what it deems the significant difference between intrastate carrier common line *charges* and *costs*. Quite reasonably, however, the Commission dismisses such semantic subtleties and responds that the statutory prohibition of a "substitute charge" necessarily calls for a case-by-case determination of whether the assessment of certain "costs" constitutes such a "charge." As the Commission explained, "To say that the PICC is allowable because it is not *the* CCLC is to render the clear legislative intent of [§ 196.196(2)(b)3], and its prohibition against substitute carrier common line charge[s], meaningless." We agree. The very concept of a "substitute" charge necessarily envisions flexibility in application. After all, "substitute" means "that which stands in the place of an-

other; that which stands in lieu of something else." *See* BLACK'S LAW DICTIONARY 1429 (6th ed. 1990).

¶ 29. Indeed, at oral argument before this court, counsel for Ameritech, acknowledging the chameleon-like nature of costs and charges, could not avoid a critical concession. First disputing the Commission's conclusion that the PICC recovered common line revenues, he contended that no common line carrier charges "reappear" in the PICC. He later commented, however, that the PICC "is a common line charge," and then asserted, "That's true, but it also covers other costs as well." Clearly, the fact that the PICC *also* covered other costs does not defeat the Commission's conclusion that it was a substitute charge.

¶ 30. Nevertheless, Ameritech protests that its implementation of the PICC was "revenue neutral"— i.e., that its "total intrastate access charge revenues remained the same both before and after it implemented the new, FCC-mandated access charge rate structure" for interstate access. Thus, Ameritech maintains, its PICC implementation did not violate WIS. STAT. § 196.196(2)(b)3. We disagree.

¶ 31. Whether, ultimately, Ameritech's PICC implementation was revenue neutral lies beyond any analysis needed here; as the Commission points out, revenue neutrality really does not matter. The Commission explains:

> The purpose of access reform is to eliminate implicit subsidies historically contained in access charges, which are a barrier to competition, and reduce the charges paid by the [interexchange carriers]. Hence, not only is the concept of "revenue neutrality" irrelevant, given that other access rate elements have been reduced, the focus on revenue neutrality clearly sug-

427

gests that Ameritech is seeking to recover costs that it surrendered when it elected price regulation.

¶ 32. And as *Ameritech* so carefully explains, "setting access charges in the telecommunications industry has never been based on strict cost causation principles," and the FCC's development of the PICC "was not based on cost causation." Thus, as Ameritech recognizes, "To the extent that the federal *inter*state access charge rate structure was not developed through strict cost causation principles, neither was Wisconsin's."

¶ 33. Therefore, by explaining that "[i]n setting the respective rates among the various classes of rate-payers, the regulator is not bound by cost causation," Ameritech also helps us understand that neither profit, nor loss, nor revenue neutrality is the pivot point on which this issue turns.[9] Precisely because, as Ameritech so carefully advises, "[c]ost allocation and whether charges should directly follow costs remains only one part of access charge rate setting," revenue neutrality is not determinative.[10] And precisely because, as Amer-

___

[9] In fact, from the accounting intricacies afflicting this field, it may not always be possible to determine whether profit, loss, or income neutrality has resulted from a given pricing mechanism. *See AT&T Communications of Ill., Inc.*, 349 F.3d at 408 (where parties disputed whether rate covered or exceeded costs, "[b]oth propositions could be true," given a price-setting method that was of a "future-oriented, hypothetical-cost nature").

[10] Ameritech explains that "[a]ccess charges include many components," and that "[u]nderstanding access charges is difficult because of their sheer number of components and their varied and changing applications." Ameritech elaborates that the complications of setting access charges are many, relating to traffic-sensitive costs tied to call volume, and non-traffic-sensitive costs tied to technology that is "shared" and remains in place regardless of call volume. Further, Ameritech acknowl-

itech so emphatically elaborates, "[c]ompeting public policy considerations, not related to cost, also go into access charge rate-setting," the determination of whether an access charge is a "substitute" charge does not necessarily vary according to the endless, linguini loops linking Ameritech's costs and charges.

¶ 34. Ameritech, in its brief to this court, acknowledges that "[n]o accurate way exists to allocate 'common' or 'shared' costs of the local network between and among various [carriers] and end users that use the local network to start and end long distance calls." Then, significantly, Ameritech concedes that "[t]he allocation of common costs, therefore, is largely influenced by one's perspective and by policy considerations." If that is so, on what logical or legal basis could we reject the Commission's call—a call that necessarily involved its best effort to determine what Ameritech concedes, perhaps cannot be accurately determined, and a call that inevitably involved its perspective and policy considerations?

¶ 35. "[T]he reviewing court must examine the record for substantial evidence which supports the agency's conclusion." *Knight v. LIRC*, 220 Wis. 2d 137, 149–50, 582 N.W.2d 448 (Ct. App. 1998). Here, the evidentiary record, largely undisputed, offers ample support for the Commission's conclusion that Ameritech reinstated an intrastate carrier common line

edges, "[n]o accurate way exists to allocate" these shared costs "between and among various [interexchange carriers] and end users that use the local network to start and end long distance calls."

charge in the form of the PICC, thus constituting a "substitute charge" in violation of WIS. STAT. § 196.196(2)(b)3.[11]

---

[11] Without retreating from our conclusion that the Commission's determination is due great-weight deference, we also note that, under the due deference standard, we still would affirm on the cross-appeal.

"Due deference" is only a "slightly lower degree of deference" than "great weight deference." *Jackson v. Employe Trust Funds Bd.*, 230 Wis. 2d 677, 686–87 n.3, 602 N.W.2d 543 (Ct. App. 1999). As we explained:

> While the difference between "due" and "great" deference is often elusive, it makes little difference in most cases, for in both instances the central question is whether the agency's decision is reasonable. The only difference is that, if due-weight deference is the standard, we will sustain the agency's reasonable determination *unless* an opposing interpretation is more reasonable, while under the great-weight deference rule, the reasonableness of the agency's interpretation is the *only* question.

*Id.*

In *CenturyTel of the Midwest-Kendall, Inc. v. Public Service Comm'n*, 2002 WI App 236, 257 Wis. 2d 837, 653 N.W.2d 130, *review dismissed*, 2003 WI 1, 258 Wis. 2d 111, 655 N.W.2d 130 (Nov. 12, 2002) (No. 02–0053), reviewing an issue involving telecommunications rate changes under WIS. STAT. § 196.20, we deemed it unnecessary to decide whether the Commission's construction and application of that statute should be accorded due weight or great weight because, we concluded, "we should give at least due weight" to the Commission's decision. *Id.*, ¶ 18. Doing so, we concluded that the Commission's determination "comport[ed] with the purpose of the statute" and was not countered by "a more reasonable interpretation." *Id.* Here, under the due weight standard, we would reach the same conclusion for the reasons we have explained.

## III. THE APPELLANTS' APPEAL

¶ 36. The appellants challenge the circuit court's reversal of the Commission's order that Ameritech refund the approximately $18,000,000 gained from its improper charges. The circuit court concluded that, under WIS. STAT. § 196.37(2), the Commission had exceeded its authority. The statute provides:

> If the commission finds that any measurement, regulation, practice, act or service is unjust, unreasonable, insufficient, preferential, unjustly discriminatory or otherwise unreasonable or unlawful, or that any service is inadequate, or that any service which reasonably can be demanded cannot be obtained, the commission shall determine and make any just and reasonable order relating to a measurement, regulation, practice, act or service to be furnished, imposed, observed and followed *in the future.*

WIS. STAT. § 196.37(2) (emphasis added).

¶ 37. Here, again, we first encounter the parties' dispute over the standard of review. But essentially the same dispute was settled years ago and, unquestionably, the case law establishes that our review of this issue is *de novo.*

■

¶ 38. In *GTE North, Inc. v. Public Service Comm'n,* 176 Wis. 2d 559, 500 N.W.2d 284 (1993), the supreme court, determining whether the Commission had authority to order a refund, under § 196.37(2), of "compensation collected . . . in violation of [the utility's] filed tariffs," *id.* at 562, concluded that "[d]ecisions of an agency which deal with the scope of the agency's own power are not binding" and, accordingly, applied *de novo* review, *id.* at 564. In *Wisconsin Power & Light Co. v. Public Service Comm'n,* 181 Wis. 2d 385, 511 N.W.2d

291 (1994), the supreme court, determining whether the Commission had authority to order a "lump sum penalty based on [the utility's] past imprudent management" and to order a "refund [of] validly collected revenue," *id.* at 388, 392, concluded that "courts owe no deference to an agency's determination concerning its own statutory authority," *id.* at 392. And in *CenturyTel of the Midwest-Kendall, Inc. v. Public Service Comm'n,* 2002 WI App 236, 257 Wis. 2d 837, 653 N.W.2d 130, *review dismissed,* 2003 WI 1, 258 Wis. 2d 111, 655 N.W.2d 130 (Nov. 12, 2002) (No. 02–0053), we recently concluded that in reviewing "the authority of the [Commission] to order refunds [under WIS. STAT. § 196.37(2)], we will employ a de novo standard of review," *id.,* ¶ 25. Thus, unlike situations where we give varying degrees of deference to an administrative agency's substantive decisions, we give no deference to the Commission's determination of its own authority.

¶ 39. In this case, the circuit court, reversing the Commission, concluded that because WIS. STAT. § 196.37(2) provides for remedial measures to be "followed in the future," the Commission had no authority to order the refund. Reaching that conclusion, however, the circuit court did not have the benefit of this court's decision in *CenturyTel,* decided two days later. Clearly, under *CenturyTel,* the Commission could order the refund.

¶ 40. In *CenturyTel,* the Commission concluded that CenturyTel, a telecommunications company, had increased rates without the required filing, hearing, and approval, in violation of WIS. STAT. § 196.20(2m) and, therefore, had violated the filed-rate requirements of WIS. STAT. § 196.22. *CenturyTel,* 257 Wis. 2d 837, ¶ 1. Under these circumstances, the Commission also concluded, a refund of the revenue generated by the

increased rates did not constitute retroactive ratemaking under WIS. STAT. § 196.37(2). *Id.*, ¶ 38.

¶ 41. In *CenturyTel*, relying heavily on the analysis in *GTE North*, we explained that "[o]rdering a refund of rates *previously authorized* by the [Commission], whether on an interim or permanent basis, violates the rule against retroactive ratemaking." *Id.*, ¶ 32 (emphasis added). At the same time, however, we emphasized that where the Commission has not made a final order authorizing rates, *see id.*, and where the Commission determines that "past charges, practices, acts or services . . . have been unlawful," *see id.*, ¶ 36, the words "in the future," under WIS. STAT. § 196.37(2), "could not be construed as a limitation on the [Commission's] authority" to order a refund, *see id.*

¶ 42. We conclude that *CenturyTel* controls. Here, as in *CenturyTel*, the Commission did not order the revision of approved, lawful rates. Rather, having concluded that the PICC charges were unlawful, it ordered a refund of the resulting revenue.

¶ 43. Vigorously disputing the Commission's conclusion, Ameritech points to the Commission staff's initial acceptance of its charges, *see* n.6 above. As Ameritech confirmed at oral argument, however, it is not arguing any theory based on estoppel, laches, or reliance. Still, understandably, Ameritech questions the fairness of the refund, given the staff's action. Interestingly enough, however, the fact of the staff's initial acceptance actually carries this case remarkably close to the circumstances in *CenturyTel*.

¶ 44. In *CenturyTel*, Commission staff, in correspondence responding to CenturyTel's submission of a modified rate schedule, expressed its acceptance " 'with the understanding that it does not result in an unauthorized rate increase or service restriction.' " *Id.*, ¶ 5

433

(citation omitted). Subsequently, however, competitors of CenturyTel complained that the rate modification constituted an unlawful rate increase for which a hearing and Commission approval would have been required. *Id.*, ¶ 6. Following a subsequent hearing, the Commission concluded that because its staff had erred in accepting the rate modification, "it would be unjust to impose a penalty" on CenturyTel. *Id.*, ¶ 9. The Commission also concluded, however, that while a penalty would be unjust, a refund, with interest, would be fair. *Id.*

¶ 45. Here, as in *CenturyTel*, the utility argues that the Commission, through its staff's correspondence, "approved the filing of the new rates without a hearing." *Id.*, ¶ 17. Here, however, the Commission never "approved." As in *CenturyTel*, the staff's acceptance was "apparently based on information" offered only by the utility. *Id.*, ¶ 20. Here, as in *CenturyTel* "there was no hearing on the new access rates and the [Commission] did not issue an order approving them." *Id.*, ¶ 17. Here, as in *CenturyTel*, a hearing only came after complaints from competitors. *Id.*, ¶¶ 6–7. Here, as in *CenturyTel*, the Commission only reached its conclusion on the *lawfulness* of the tariff following that hearing. *Id.*, ¶¶ 8–9.

■■■

¶ 46. Thus, in the instant case, we conclude that the staff determination in 1997 did not preclude the Commission's conclusion following Ameritech's attempt to amend its exception tariff in 1998. And here, consistent with *CenturyTel*, notwithstanding the staff's correspondence (and even assuming, as in *CenturyTel*, that the staff may have erred), we conclude that the refund does not violate Wis. Stat. § 196.37(2). *See id.*, ¶ 36.

¶ 47. Ameritech argues, however, that *CenturyTel* is significantly distinguishable because it involved a rate-of-return company, not a price cap company. Ameritech maintains, therefore, that *CenturyTel*'s conclusions are anchored in its determination that Century-Tel had failed to properly file its rates. *See id.*, ¶ 22. Moreover, Ameritech maintains that, unlike Century-Tel, it properly filed its rate request. The argument is interesting, but unavailing.

¶ 48. While the distinction Ameritech draws is accurate, it is less significant than the common bonds between the two cases. Whether a company is rate-of-return or price cap, and whether its charges are "rates" or "tariffs," the charges must be lawful. And whether a question of lawfulness is posed during a rate review or a tariff challenge, the Commission has authority to determine the lawfulness of the charge.

¶ 49. Regardless of whether the utility is rate-of-return or price cap, *CenturyTel* clarifies that WIS. STAT. § 196.37(1) addresses, in part, the *reasonableness* of rates and charges, but § 196.37(2), by contrast, addresses, in part, the *lawfulness* of "any measurement, regulation, practice, act or service." Once a rate (by virtue of its improper filing and lack of approval, as in *CenturyTel*) is determined to be *unlawful,* or once a charge (by virtue of its improper substitution, as in the instant case) is determined to be a practice that is *unlawful,* it is subject to the remedial authority of § 196.37(2). Under *CenturyTel*, § 196.37(2) provides the Commission authority to order a refund.

¶ 50. Therefore, we really are not addressing any

issue involving the filed-rate doctrine, *see* Wis. Stat. § 196.22,[12] except to say that Ameritech, through its implementation of the PICC, effectively altered its "rate"—its access charges—in an *unlawful* manner. And, in the same sense, we really are not addressing any issue involving retroactive ratemaking except to say that, under these circumstances, a refund does not make or re-make "rates." The refund simply corrects an unlawful charge.

¶ 51. If, however, one views this case through the filed-rate-doctrine lens, the conclusion is equally clear. As the supreme court explained: "Under the filed rate doctrine, codified in sec. 196.22, Stats., a utility must charge the rate that it files with the commission and that the commission approves. If a utility charges its customers a higher rate, the [commission] may order the utility to refund its excess revenue." *Wisconsin Power & Light*, 181 Wis. 2d at 396. Thus, in *Wisconsin Power & Light*, because the Commission had ordered a refund of "validly collected revenue" through a rate the Commission had approved years earlier, *id.* at 392, the lump sum penalty it ordered (which was "derived . . . directly from the actual overcharges" resulting from the utility's imprudent administration of a coal contract), violated the rule against retroactive ratemaking, *id.* at 393, 390. Here, by contrast, the Commission was not

---

[12] Wisconsin Stat. § 196.22 provides:

**Discrimination forbidden.** No public utility may charge, demand, collect or receive more or less compensation for any service performed by it within the state, or for any service in connection therewith, than is specified in the schedules for the service filed under s. 196.19 [relating, in part, to the filing of rates with the Commission, and prohibiting any change of rates "except as provided under this chapter"], including schedules of joint rates, as may at the time be in force, or demand, collect or receive any rate, toll or charge not specified in the schedule.

dealing with "validly collected revenue," *id.* at 392, and, therefore, it had the authority to "order the utility to refund its excess revenue." *Id.* at 396.

¶ 52. As the supreme court emphasized, WIS. STAT. § 196.37(2) "is a remedial statute and it must therefore be liberally construed to effect as reasonably as possible its beneficent purpose." *GTE North*, 176 Wis. 2d at 569. And, in *CenturyTel*, with words that would require only modest modification for exact application here, we concluded:

> [T]he plain language of WIS. STAT. § 196.37(2) is broad enough to authorize the refund order in this case. The [Commission] determined [the company's] "act" of increasing rates was "unlawful" . . . . The court in *GTE North* concluded that the "in the future" language in § 196.37(2) was not a limitation on the [Commission's] authority to order a refund in that case, and that the refund order was authorized because it was "a just and reasonable order regarding a 'measurement, regulation, act, practice, or service.' " We see no basis on which to conclude that the refund order in this case is not also authorized by § 196.37(2). Given the desirability of strict enforcement of the filed-rate statute, which the court in *GTE North* recognized, we see no significant difference between charging a rate that the utility believes is included in a tariff but the [Commission] concludes is not, as in *GTE North*, and charging a rate that the utility believes was properly filed with the [Commission] but the [Commission] concludes was not.

*CenturyTel*, 257 Wis. 2d 837, ¶ 42 (citation omitted).

¶ 53. And this makes sense. As the Commission argues, if it lacked the authority to order the refund in this case, "a price cap utility would have a strong incentive to impose illegal charges, because it could keep ill-gotten revenues." That, the Commission cor-

rectly explains, inevitably would result in "harm to consumers, both carriers and the public, in the form of increased rates, undesirable subsidies and lessened competition," thus defeating the legislative effort to provide for a competitive telecommunications market.

¶ 54. Accordingly, while we affirm the circuit court's order affirming the Commission's decision that Ameritech's charges were unlawful, we reverse the order to the extent that it reversed the Commission's decision that Ameritech refund the unlawful charges.

*By the Court*—Order affirmed in part; reversed in part and cause remanded.

¶ 55. WEDEMEYER, P.J. (*concurring in part; dissenting in part*). I concur with the Majority's conclusion in part II B of this opinion—the Commission reasonably concluded that Ameritech's long-distance charges constituted a "substitute charge" for the carrier common line charge and, therefore, were unlawful under WIS. STAT. § 196.196(2)(b)3 (2001–02). I disagree, however, with the Majority's reversal of the circuit court's decision that refunds were not authorized. Accordingly, I must respectfully dissent from part III of the majority opinion.

¶ 56. I agree with the circuit court that the Commission does not have the authority to order Ameritech to refund approximately $18,000,000 gained from the unlawful charges. The circuit court based this decision on the language of WIS. STAT. § 196.37(1) (2001–02) which prohibits retroactive ratemaking. It provides:

> If, after an investigation under this chapter or ch. 197, the commission finds rates, tolls, charges, schedules or joint rates to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential or otherwise unreasonable or unlawful, the commission shall deter-

mine and order reasonable rates, tolls, charges, schedules or joint rates to be imposed, observed and followed *in the future.*

(Emphasis added.) WISCONSIN STAT. § 196.37(2) (2001–02) offers similar prospective-only language:

> If the commission finds that any measurement, regulation, practice, act or service is unjust, unreasonable, insufficient, preferential, unjustly discriminatory or otherwise unreasonable or unlawful, or that any service is inadequate, or that any service which reasonably can be demanded cannot be obtained, the commission shall determine and make any just and reasonable order relating to a measurement, regulation, practice, act or service to be furnished, imposed, observed and followed *in the future.*

(Emphasis added.)[1] This language, in plain terms, sets forth the time sequence for corrective measures: the Commission is not authorized to engage in retroactive ratemaking, but may adjust rates prospectively, only. The case law is consistent with this interpretation. *See Kimberly-Clark Corp. v. Public Serv. Comm'n,* 110 Wis. 2d 455, 461–62, 329 N.W.2d 143 (1983) (the PSC has only those powers which are expressly conferred or necessarily implied by the statutes). "No provision in ch. 196, Stats., expressly authorizes the commission to order a utility to refund money to its customers when the utility may have acted imprudently." *Wisconsin Power & Light Co. v. Public Serv. Comm'n,* 181 Wis. 2d 385, 392, 511 N.W.2d 291 (1994). The rule against

---

[1] The parties present opposing views as to whether WIS. STAT. § 196.37(1) or (2) (2001–02) applies. The circuit court relied on § 196.37(1). The majority opinion refers to § 196.37(2). Nevertheless, both subsections contain the same prospective-only language.

retroactive ratemaking is "firmly ensconced in Wisconsin law." *Id.* at 393. Moreover, if any doubt exists as to an implied power that may exist, that doubt "should be resolved against the exercise of such authority." *Kimberly-Clark Corp.*, 110 Wis. 2d at 462.

¶ 57. There are certain exceptions to the prohibition against retroactive ratemaking, wherein refunds are allowed under very narrow circumstances. *See Wisconsin Power & Light Co.*, 181 Wis. 2d at 393 (Commission may order a utility to set future rates high enough to recoup past "extraordinary losses."); *GTE North, Inc. v. Public Serv. Comm'n*, 176 Wis. 2d 559, 500 N.W.2d 284 (1993) (refunds may be ordered when the utility collected rates in violation of the filed tariffs, "filed-rate doctrine exception"); *CenturyTel of the Midwest-Kendall, Inc. v. Public Serv. Comm'n*, 2002 WI App 236, 257 Wis. 2d 837, 653 N.W.2d 130 (refunds may be ordered when utility increases rates without complying with tariff filing requirements).

¶ 58. None of these exceptions, however, apply to the instant case. Here, Ameritech followed the proper procedures for filing its tariffs. It did not charge more than what the filed tariffs permitted. The majority concludes that the *CenturyTel* case controls and allows the refund. I disagree.

¶ 59. In my opinion, *CenturyTel* is distinguishable from the instant case. In *CenturyTel*, the utility failed to comply with the procedural requirements regarding access rate increases. *Id.*, ¶ 8. The PSC concluded that the utility had violated the filed rate statute by charging access rates that were not properly filed pursuant to statute. *Id.*, ¶ 10. Hence, the filed-rate-doctrine exception to the prohibition against retroactive ratemaking applied in *CenturyTel*. This is not the factual scenario presented in the instant case. Rather, it is undisputed

that Ameritech complied with the proper procedural requirements in filing its tariffs as required by the statutes. It was a later *substantive* challenge by the appellants that led to the conclusion that the approved rates actually constituted a substitute charge for the carrier common line charge. Therein lies the distinction between this case and *CenturyTel*. Accordingly, in my opinion, the instant case is governed by the general rule that the Commission does not have the authority to order retroactive refunds, and not by the specific exceptions to that rule allowed in particular cases.

¶ 60. Finally, the majority suggests that ordering a refund is the only way to remedy the wrong which occurred here. I disagree. There are other remedies available to the appellants to recoup the unlawful charges, without having to grant the Commission authority, which is prohibited by statute. Specifically, WIS. STAT. § 196.219(4m) (2001–02) provides the means for any person injured to recoup losses as a result of the unlawful charges through a civil action.

¶ 61. Based on the foregoing, I would affirm the decision of the trial court *in toto*.