WISCONSIN DEPARTMENT OF REVENUE,
Petitioner-Respondent,†

v.

A. GAGLIANO CO., INC., Respondent-Appellant.

Court of Appeals

*No. 2003AP3538. Submitted on briefs September 7, 2004.
—Decided June 2, 2005.*

2005 WI App 170

(Also reported in 702 N.W.2d 834.)

† Petition to review denied 9-8-05.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Joseph A. Pickart* of *Michael Best & Friedrich LLP*, Milwaukee.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Mary E. Burke*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Deininger, P.J., Vergeront and Lundsten, JJ.

¶ 1. LUNDSTEN, J. This is a tax case involving the application of the term "manufacturing property" found in WIS. STAT. § 70.995 (2003–04)[1] to a facility owned by the appellant, A. Gagliano Company, Inc. Gagliano's facility is used to ripen tomatoes and other produce, which Gagliano then sells to chain warehouses, food service suppliers, and produce wholesalers.

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

The respondent, Department of Revenue, repeatedly denied Gagliano's requests that its ripening facility be treated as "manufacturing property." Gagliano sought review before the Tax Appeals Commission, and the commission ruled in favor of Gagliano. The commission concluded that Gagliano's ripening facility is entitled to tax treatment as "manufacturing property" within the meaning of the statute. The circuit court, however, set aside the commission's decision and ruled in favor of the department. Gagliano appeals the circuit court's order. We reverse the circuit court's order and reinstate the commission's decision.

## Background

¶ 2. In February 1999, Gagliano asked the Department of Revenue to classify Gagliano's produce-ripening activities at a Milwaukee facility as "manufacturing" and, therefore, to classify the entire facility as "manufacturing property" under WIS. STAT. § 70.995.[2] Gagliano argued that the activity conducted in its

[2] WISCONSIN STAT. § 70.995 provides, in part:

(1) APPLICABILITY. (a) In this section "manufacturing property" includes all lands, buildings, structures and other real property used in manufacturing, assembling, processing, fabricating, making or milling tangible personal property for profit . . . .

(b) . . . Manufacturing production is usually carried on for the wholesale market, for interplant transfer or to order for industrial users rather than for direct sale to a domestic consumer.

. . . .

(d) Except for the activities under sub. (2), activities not classified as manufacturing in the standard industrial classification manual, 1987 edition, published by the U.S. office of management and budget are not manufacturing for this section.

(2) FURTHER CLASSIFICATION. In addition to the criteria set forth in sub. (1), property shall be deemed prima facie manufacturing

sophisticated ripening chambers is a manufacturing activity. The department denied Gagliano's request after concluding that Gagliano was primarily engaged in the wholesale distribution of fruits and vegetables. Gagliano filed an objection with the department's State Board of Assessors, and then sought review before the Tax Appeals Commission.

¶ 3. In each of the next two years, Gagliano filed similar requests with the department. The department denied the requests, and each time Gagliano sought agency review. The commission consolidated the three matters into one proceeding. After holding a two-day evidentiary hearing regarding all three years, the commission reversed the department, concluding that Gagliano's facility is "manufacturing property" within the meaning of Wis. Stat. § 70.995.

¶ 4. The department petitioned the circuit court for review of the commission's decision. The circuit court set aside the commission's decision, essentially adopting the department's view that Gagliano's ripening chambers are not "manufacturing property" and that Gagliano is primarily a wholesale distributor of fruits and vegetables. Under applicable standards, property used *primarily* for the wholesale distribution of fruits and vegetables is not "manufacturing property" within the meaning of Wis. Stat. § 70.995. Gagliano appeals.

---

property and eligible for assessment under this section if it is included in one of the following major group classifications set forth in the standard industrial classification manual, 1987 edition, published by the U.S. office of management and budget. For the purposes of this section, any other property described in this subsection shall also be deemed manufacturing property and eligible for assessment under this section . . . .

## Discussion

¶ 5. This case presents a close question: Did the commission reasonably determine that Gagliano's ripening chambers, and thus its facility, are "manufacturing property" as that term is used in Wis. Stat. § 70.995? We conclude that the commission's decision is entitled to great weight deference and, under this standard, we affirm the commission. Consequently, we reverse the circuit court's order.

¶ 6. Before proceeding, we clarify the parties' dispute. The question is not whether Gagliano, as a business, is or is not a wholesale distributor of fresh fruits and vegetables. It is. The question is whether Gagliano's facility is "manufacturing property" based on the nature of its ripening chambers. The answer to this question does not turn on whether Gagliano is a wholesaler of fresh fruits and vegetables. Indeed, the department does not argue that, even if Gagliano's ripening chambers are properly classified as "manufacturing" under Wis. Stat. § 70.995, those chambers are an insufficient part of Gagliano's activity to permit the full facility to be treated as "manufacturing property." Rather, the essence of the department's position is that the ripening activity that goes on in Gagliano's ripening chambers is nonmanufacturing and, therefore, that Gagliano is nothing more than a wholesaler of fresh fruits and vegetables. Thus, we conclude that the proper resolution of this case turns on an analysis of the activity that occurs in the ripening chambers.

¶ 7. We review the commission's decision, not the circuit court's. *Hafner v. DOR*, 2000 WI App 216, ¶ 3, 239 Wis. 2d 218, 619 N.W.2d 300. In the discussion that follows, we first summarize the commission's findings of fact. Second, we summarize the commission's analy-

sis and legal conclusion that Gagliano's facility is manufacturing property under Wis. Stat. § 70.995. Third, we determine what standard of review should apply to the commission's legal conclusion. Finally, we apply that standard of review to the commission's conclusion and affirm that conclusion.

## Commission's Findings of Fact

¶ 8. The commission's decision included the following findings of fact.

¶ 9. Gagliano is primarily engaged in the purchasing, ripening, storage, and sale of fresh produce, including tomatoes, bananas, and avocados. Tomatoes constitute approximately 80 to 85% of this produce, and bananas constitute approximately 5%. Gagliano sells its produce to chain warehouses, food service suppliers, and produce wholesalers. Gagliano does not sell its produce directly to consumers.

¶ 10. In 1997 or 1998, Gagliano installed twenty state-of-the-art ripening chambers. Each chamber is a self-contained, pressurized, two-level unit made of insulated panels. The walls of the chambers are independent and separate from the walls of Gagliano's building. Each chamber is equipped with "ripening control" equipment, including ceiling-mounted discharge coils, duct systems with ventilating fans and dampers, air deflectors, refrigeration equipment, two pumping stations, heat exchangers, fans, lights, heaters, supports, curbing, racking, and specially designed doors.

¶ 11. In addition, each chamber has a control panel that allows Gagliano to monitor and control the temperature, the levels of ethylene,[3] carbon dioxide and oxygen, and other atmospheric conditions within the

---

[3] Increased levels of ethylene gas accelerate the ripening process, while decreased levels slow down the ripening process.

749

chamber. The control panel has other functions and is connected to a central computer that monitors, records, and controls the performance of each ripening cycle. The control panel in each chamber can also operate independently. In order to accelerate or slow down the ripening process, Gagliano can enter information in either the central computer or an individual control panel.

¶ 12. "Traditional" ripening rooms lack these sophisticated features, but they do involve some temperature control and they do permit the use of ethylene gas.

¶ 13. Gagliano's suppliers harvest tomatoes when they are unripe green tomatoes. In the produce business, these tomatoes are commonly called "mature greens." Mature greens are "stone-hard to the touch, green in color, starchy in taste, 'earthy' in aroma." Gagliano places boxes of mature greens in its chambers and enters a computer program called a "ripening recipe" into its central computer, which controls numerous atmospheric conditions. The ripening recipes vary, permitting Gagliano to control ripening in a manner to meet customers' needs in terms of timing, quality, and quantity.

¶ 14. Gagliano's chamber-ripening process transforms mature greens into "ripened, edible tomatoes which are soft and juicy (not stone-hard), orange or red (not green), sweet (not starchy), and pleasantly aromatic (not 'earthy')." The ripening process changes the tomatoes' color, texture, taste, size, and weight, thus making them marketable.

¶ 15. Gagliano also ripens bananas, avocados, and other produce in the chambers in the same general manner as tomatoes. As with tomatoes, the process changes the physical and chemical composition, appearance, and marketability of this other produce.

*The Framework for Analysis, the Commission's Application of that Framework, and the Commission's Legal Conclusion*

¶ 16. The legal framework for analyzing whether property is "manufacturing property" for purposes of WIS. STAT. § 70.995 is set forth in *Zip Sort, Inc. v. DOR*, 2001 WI App 185, ¶¶ 11–14, 247 Wis. 2d 295, 634 N.W.2d 99. We first ask whether the activity in question fits "perfectly" into any of the categories specifically listed as manufacturing in the STANDARD INDUSTRIAL CLASSIFICATION MANUAL (Executive Office of the President, Office of Management and Budget, 1987 ed.) (SIC Manual) or § 70.995(2). *See Zip Sort*, 247 Wis. 2d 295, ¶¶ 7, 23.[4] If it does not, a second question is addressed: Does the activity nonetheless fit the general definition of manufacturing in § 70.995(1)? *Zip Sort*, 247 Wis. 2d 295, ¶¶ 7, 23. Whether an activity is manufacturing under the general definition in § 70.995(1) may be resolved by reference to three questions set forth in the Wisconsin Property Assessment Manual (the assessment manual), a manual promulgated by the department. *Zip Sort*, 247 Wis. 2d 295, ¶ 7.[5]

---

[4] Most of the categories listed in WIS. STAT. § 70.995(2) are also listed in the SIC Manual, and most of these categories are, in turn, listed as manufacturing within the SIC Manual. However, some categories listed as manufacturing in § 70.995(2), including "10—Metal mining," are not listed under manufacturing in the SIC Manual.

[5] In *Zip Sort, Inc. v. DOR*, 2001 WI App 185, 247 Wis. 2d 295, 634 N.W.2d 99, we concluded that the commission's decision to make determinations under the general definition by resort to the assessment manual was reasonable. *Id.*, ¶ 24. Here, both parties' arguments seem to assume, as in *Zip Sort*,

¶ 17. Before the commission, the parties both argued that the commission should apply the three assessment manual questions. Accordingly, the commission turned to the assessment manual questions:

> 1. Is the activity more similar to those specifically classified manufacturing by law and the SIC Manual, or more similar to those specifically classified nonmanufacturing by law and the SIC Manual?
>
> 2. Is the activity more closely aligned with the general description of producing, assembling, fabricating, making or milling by machinery and equipment of a new article with a different form, use and name from existing materials, or is it more aligned with the general activities involved with services as generally described in the SIC Manual, wholesale trade, retail trade, agriculture, or construction?
>
> 3. Does the activity produce products more for wholesalers, interplant transfer, to order for industrial users or more for direct sale to domestic consumers?

*Zip Sort*, 247 Wis. 2d 295, ¶ 9.

¶ 18. In applying the first question—whether an activity is more similar to those specifically classified manufacturing by law and the SIC Manual, or more similar to those specifically classified nonmanufacturing by law and the SIC Manual—the commission relied on the general description of manufacturing activities

---

that the commission acted properly by resorting to the assessment manual. Thus, we are not presented with the question of whether the commission *must* resort to the assessment manual when a business's activities do not fall perfectly into any of the categories specifically listed as manufacturing in the SIC Manual or WIS. STAT. § 70.995(2).

as set forth in the SIC Manual.[6] The commission applied the following language from the SIC Manual:

> The manufacturing division includes establishments engaged in the mechanical or chemical transformation of materials or substances into new products . . . .
>
> The materials processed by manufacturing establishments include products of agriculture . . . . The new product of a manufacturing establishment may be finished in the sense that it is ready for utilization or consumption . . . .
>
> The materials used by manufacturing establishments may be purchased directly from producers . . . . Manufacturing production is usually carried on for the wholesale market . . . rather than for direct sale to the domestic consumer.

*See* SIC Manual, at 67. In the commission's view, this language supports the conclusion that Gagliano's ripening chambers constitute "manufacturing property." The commission explained that Gagliano's "sophisticated ripening chambers and related computers are major factors in the chemical transformation of raw produce to the new products of mature, marketable produce."

---

[6] We note that the commission's approach to the first question does not appear to track the question. Rather than compare the activity in the ripening chambers with activities specifically classified as manufacturing or nonmanufacturing by law or the SIC Manual, the commission looked to the general description of manufacturing in the SIC Manual. Nonetheless, as we explain, the commission plainly rejected the department's argument that Gagliano's ripening activity was similar to an activity specifically classified as nonmanufacturing in the SIC Manual.

¶ 19. The commission rejected the department's argument that Gagliano's activities were like SIC *non*-manufacturing category 5148, which covers "[e]tablishments primarily engaged in the wholesale distribution of fresh fruits and vegetables," a category that includes as subcategories "Banana ripening for the trade—wholesale." *See* SIC Manual, at 307. The other subcategories in category 5148, as the commission noted, are "Fruits, fresh—wholesale," "Potatoes, fresh—wholesale," and "Vegetables, fresh—wholesale." *See id.* The commission surmised that the reference to banana ripening in the context of the overall description of category 5148 was a reference to "passive" ripening of bananas while in traditional storage, not the "sophisticated process employed by Gagliano."

¶ 20. The commission then applied the second assessment manual question, which asks whether a business's activity is more closely aligned with the general description of producing, assembling, fabricating, making, or milling by machinery and equipment of a new article with a different form, use, and name from existing materials, or is more aligned with the general activities involved with services as generally described in the SIC Manual, wholesale trade, retail trade, agriculture, or construction. In applying the second question, the commission reasoned as follows:

> [Gagliano's] activities produce (by applying ethylene gas and controlling temperature and humidity) by machinery (ripening chambers and related computers) a new article (edible, ripe produce) with a different form (for example, processing tomatoes from stone-hard, green, starchy tasting, earthy in aroma to ripened, edible, soft, juicy, orange or red, sweet tasting, pleasantly aromatic tomatoes), with a different use (edible and commercially saleable), and with a different

name (ripened, edible produce) from existing materials (unripened tomatoes, ethylene gas, humidity, temperature).

Gagliano's activities, the commission reasoned, are less aligned with nonmanufacturing services and are "far more complex than the mere wholesale distribution of produce."

¶ 21. Finally, the commission applied the third question, which asks whether the product is intended "more for wholesalers, interplant transfer, to order for industrial users or more for direct sale to domestic consumers." The commission determined that Gagliano sells its produce to chain warehouses, food service providers, and produce wholesalers, rather than to domestic consumers.

*Standard of Review Applicable to the Commission's Conclusion that Gagliano's Facility Is Manufacturing Property Under WIS. STAT. § 70.995*

¶ 22. This case involves the commission's application of WIS. STAT. § 70.995 to a particular set of facts. When we review an administrative agency's interpretation or application of a statute, there are three possible levels of review: great weight deference, due weight deference, and *de novo. Zip Sort*, 247 Wis. 2d 295, ¶¶ 11–14. As discussed in more detail below, the level of deference we apply is largely determined by reference to the decision-making agency's expertise and experience in applying the statute at issue.

¶ 23. The department effectively takes the position that the standard of review does not matter because the commission's application of the statute is "patently unreasonable and irrational" and, therefore,

cannot stand regardless of the level of deference we apply. Consequently, the department does not address the commission's level of expertise and experience.[7] Gagliano asserts that the commission's decision is entitled to great weight deference because, in Gagliano's words, the commission's "interpretation of the statute is long-standing, formed by the expertise and specialized knowledge it has gained over the years." Ultimately, neither party provides a satisfactory argument regarding which level of deference we must apply.

¶ 24. We summarized the three levels of deference in *Zip Sort*:

> When we give "great weight" deference to the agency's interpretation, we will sustain a reasonable agency conclusion even if an alternative conclusion is

---

[7] The department acknowledges the three levels of deference, and then relies on *Zip Sort* for the following assertion: "A threshold requirement for application of either the due weight deference or great weight deference standard, however, is that the agency's interpretation be reasonable." This characterization of the law does not follow from *Zip Sort* and misses the mark. It is true that courts will not uphold an unreasonable agency interpretation of a statute, regardless of the level of deference applied, but courts do not first decide the reasonableness of an agency's decision as a means of then determining whether the decision should be given a particular level of deference. The department may mean to say that we give no deference to an agency decision that contradicts the plain language of a statute, *see Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 662, 539 N.W.2d 98 (1995); *DOR v. Caterpillar, Inc.*, 2001 WI App 35, ¶ 7, 241 Wis. 2d 282, 625 N.W.2d 338, but the department does not expressly rely on this rule. In any event, the department does not assist this court in assessing whether the commission's expertise and experience support due weight deference or great weight deference.

more reasonable. We give "great weight" deference to the agency's interpretation when all of the following conditions are met: (1) the agency was charged by the legislature with the duty of administering the statute; (2) the interpretation of the agency is one of long standing; (3) the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute.

When we give "due weight" deference to the agency's interpretation, we will not overturn a reasonable agency decision that comports with the purpose of the statute unless we determine that there is a more reasonable interpretation available. We give "due weight" deference when the agency has some experience in an area, but has not developed the expertise that necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court.

When we review an agency decision de novo, we give no deference to the agency's interpretation. De novo review is appropriate if any of the following are true: (1) the issue before the agency is clearly one of first impression; (2) a legal question is presented and there is no evidence of any special agency expertise or experience; or (3) the agency's position on an issue has been so inconsistent that it provides no real guidance.

*Id.*, ¶¶ 12–14 (citations omitted).

¶ 25. We first observe that the commission's decision is entitled to at least due weight deference. In *Zip Sort*, we noted that the commission has many years of experience applying the statute at issue in this case, and we declined to review a similar commission decision *de novo. Id.*, ¶ 18; *see also Video Wisconsin, Ltd. v. DOR*, 175 Wis. 2d 195, 199–200, 498 N.W.2d 880 (Ct.

757

App. 1993). The more difficult question is whether we should apply great weight deference.

¶ 26. To repeat, courts give great weight deference when: "(1) the agency was charged by the legislature with the duty of administering the statute; (2) the interpretation of the agency is one of long standing; (3) the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute." *Zip Sort*, 247 Wis. 2d 295, ¶ 12. We have no trouble concluding that the first, third, and fourth prongs of this test are satisfied here. The prong that gives us pause is the second one requiring that the "interpretation of the agency is one of long standing." *Id.* Gagliano asserts that the commission's interpretation is one of long standing, but Gagliano does not back up this assertion. It seems undisputed that the commission has not applied WIS. STAT. § 70.995 to any type of fruit- or vegetable-ripening facility, much less that it has done so consistently in a "long-standing" manner. Yet, our review of the case law persuades us that the commission's decision is nonetheless entitled to great weight deference.

¶ 27. This court recently said the following about the "long-standing" prong:

> The case law suggests . . . that that "long-standing" language, standing alone, may be a bit misleading.
>
> To determine whether great-weight deference is due, the test "is not . . . whether the commission has ruled on the precise—or even substantially similar—facts in prior cases." *Barron Elec. Coop. v. Public Serv. Comm'n*, 212 Wis. 2d 752, 764, 569 N.W.2d 726 (Ct. App.

1997). Were that required, in cases involving the Public Service Commission, great-weight deference "would indeed be a rarity." *Id.* Thus, in this case, because the Commission was called upon to consider a novel situation . . . its interpretation, perforce, could not be "of long-standing." *See Citizens' Util. Bd.*, 211 Wis. 2d at 551–52. But certainly the mere fact that a regulated company may devise a new pricing method must not automatically reduce the deference due the regulating agency. After all, it is an agency's experience with related rules and similar circumstances that equips it to evaluate new facts and evolving regulatory systems.

If any doubt on this point remained, we erased it, explaining, in *Citizens' Utilities Bd.*, that although the Commission's determination was "unique to [that] case, the agency's practice and methods of evaluating" issues of a similar nature were of "long-standing," thus supporting great-weight deference. *Id.* at 552. *See also Virginia Sur. Co. v. LIRC*, 2002 WI App 277, ¶ 13, 258 Wis. 2d 665, 654 N.W.2d 306 ("[A]lthough the Commission has never decided a case presenting the precise facts raised by this appeal, that is not a prerequisite to giving the agency great-weight deference."), *review denied*, 2003 WI 16, 259 Wis. 2d 102, 657 N.W.2d 707 (Feb. 19, 2003) (No. 02–0031); *William Wrigley Jr., Co. v. DOR*, 176 Wis. 2d 795, 801, 500 N.W.2d 667 (1993).

*Wisconsin Bell, Inc. v. PSC*, 2004 WI App 8, ¶¶ 17–19, 269 Wis. 2d 409, 675 N.W.2d 242 (Ct. App. 2003), *aff'd*, 2005 WI 23, 279 Wis. 2d 1, 693 N.W.2d 301;[8] *see also Citizens' Util. Bd. v. PSC*, 211 Wis. 2d 537, 551–52, 565 N.W.2d 554 (Ct. App. 1997) ("Although the PSC's deter-

[8] Although the supreme court reviewed *Wisconsin Bell, Inc. v. PSC*, 2004 WI App 8, 269 Wis. 2d 409, 675 N.W.2d 242 (Ct. App. 2003), *aff'd*, 2005 WI 23, 279 Wis. 2d 1, 693 N.W.2d 301, it affirmed without an opinion in a 3–3 tie vote.

mination of 'adequacy' . . . is unique to this case, the agency's practice and methods . . . are long-standing . . . .").

¶ 28. Furthermore, in a number of recent decisions, the supreme court has applied great weight deference while giving little or no attention to the "long-standing" prong. *See Hutchinson Tech., Inc. v. LIRC*, 2004 WI 90, ¶¶ 22–24, 273 Wis. 2d 394, 682 N.W.2d 343 (citing *Crystal Lake Cheese Factory v. LIRC*, 2003 WI 106, ¶¶ 29–30, 264 Wis. 2d 200, 664 N.W.2d 651); *Brown v. LIRC*, 2003 WI 142, ¶¶ 17–18, 267 Wis. 2d 31, 671 N.W.2d 279; *Kitten v. DWD*, 2002 WI 54, ¶ 31, 252 Wis. 2d 561, 644 N.W.2d 649.[9]

¶ 29. In light of our discussion in *Wisconsin Bell*, and in light of the principles it references from *Barron Electric Cooperative v. PSC*, 212 Wis. 2d 752, 569 N.W.2d 726 (Ct. App. 1997), and *Citizens' Utility Board*, we conclude that the present case satisfies the "long-standing" prong of the great weight deference test. As we have said, the commission's overall experience in

[9] Our non-exhaustive research into the origins of the "long-standing" prong suggests that, although the prong has recently been phrased in the conjunctive with the other factors, it may derive from an older, disjunctive formulation of factors. *See West Bend Educ. Ass'n v. WERC*, 121 Wis. 2d 1, 12, 357 N.W.2d 534 (1984) ("Where a legal question is intertwined with factual determinations *or* with value or policy determinations *or* where the agency's interpretation and application of the law is of long standing, a court should defer to the agency which has primary responsibility for determination of fact and policy." (emphasis added; footnote omitted; citing *Nottelson v. DILHR*, 94 Wis. 2d 106, 115–18, 287 N.W.2d 763 (1980))). For purposes of this case, we need not decide precisely the role of the "long-standing" prong. It is sufficient to say that it does not require that an agency has previously applied a statute to the same or substantially similar facts.

applying Wis. Stat. § 70.995 is extensive. And, undoubtedly, the commission is called upon to employ its expertise and specialized knowledge when it classifies property involving recent or emerging technologies. The fact that a taxpayer employs a relatively new process does not preclude the application of great weight deference to a commission conclusion.

¶ 30. Accordingly, we apply great weight deference in reviewing the commission's legal conclusion that Gagliano's facility is manufacturing property under Wis. Stat. § 70.995.[10]

### Reasonableness of the Commission's Legal Conclusion that Gagliano's Facility Is Manufacturing Property Under Wis. Stat. § 70.995

¶ 31. Were we to assess this case independently, we might conclude that the department's interpretation and application of Wis. Stat. § 70.995 is more reasonable. However, under the great weight deference standard, we will sustain a reasonable agency conclusion even if an alternative conclusion is more reasonable. *Zip Sort*, 247 Wis. 2d 295, ¶ 12. Thus, the question before us is limited to whether the commission's decision is a reasonable one, not whether it is the more reasonable one.

¶ 32. The department argues that the commission's interpretation of the statute and its application to the facts in this case is irrational and,

---

[10] The appropriate standard of review for the commission's classification of "auxiliary" property as manufacturing property under Wis. Stat. § 70.995 may be different. *See S.C. Johnson & Son, Inc. v. DOR*, 202 Wis. 2d 714, 725–26, 552 N.W.2d 102 (Ct. App. 1996); *see also Zip Sort*, 247 Wis. 2d 295, ¶ 19.

therefore, is unreasonable. Several of the department's arguments include an attack on the commission's fact finding. We will set aside an agency's decision, or remand the matter to the agency, if the decision depends on any findings that are not supported by substantial evidence. WIS. STAT. § 227.57(6); *Krahenbuhl v. Wisconsin Dentistry Examining Bd.*, 2004 WI App 147, ¶ 15 n.3, 275 Wis. 2d 626, 685 N.W.2d 591. "Substantial evidence, for the purpose of reviewing an administrative decision, is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Krahenbuhl*, 275 Wis. 2d 626, ¶ 16. We will not reverse an agency finding of fact even if the finding is against the great weight and clear preponderance of the evidence so long as there is substantial evidence to sustain the finding. *Id.* Further, if the evidence supports more than one reasonable inference, the agency's inference is conclusive. *Crystal Lake Cheese Factory*, 264 Wis. 2d 200, ¶ 25.

¶ 33. The department first argues that Gagliano's ripening activities cannot be manufacturing because they fit "squarely" in an SIC Manual *non*manufacturing category, namely category 5148, which includes banana ripening. Category 5148 is entitled "Fresh Fruits and Vegetables" and is described as "[e]tablishments primarily engaged in the wholesale distribution of fresh fruits and vegetables." *See* SIC Manual, at 307. We disagree with the department.

¶ 34. SIC Manual category 5148 lists four subcategories:

Banana ripening for the trade—wholesale

Fruits, fresh—wholesale

Potatoes, fresh—wholesale

Vegetables, fresh—wholesale

762

*See id.* The department points to the testimony of a department district office manager, who was qualified as an expert in classification, assessment, and related rules, including the assessment manual. She testified that SIC Manual category 5148 would include ripening of other produce, in part because the same ripening chambers could be used for bananas and other produce. In addition, the department emphasizes that Gagliano holds *itself* out as a wholesaler of fresh fruits and vegetables, including in the Ameritech Yellow Pages.

¶ 35. We agree that Gagliano is a wholesale distributor of fresh fruits and vegetables. But that does not mean Gagliano's ripening chambers cannot qualify as "manufacturing property" under WIS. STAT. § 70.995.

¶ 36. Many manufacturers engage in the wholesale distribution of their products. Surely the department would not argue that a taxpayer who manufactures widgets is precluded from having its property classified as manufacturing under WIS. STAT. § 70.995 simply because that taxpayer also engages in the wholesale distribution of its widgets. Thus, to the extent the department relies on Gagliano's status as a wholesaler, we are not persuaded. We recognize that the department has tied its "wholesale" argument to the SIC Manual's wording, that is, "primarily engaged in the wholesale distribution of fresh fruits and vegetables." This is a reasonable argument, but we conclude that Gagliano's facility can just as reasonably be characterized as "primarily" engaged in *ripening,* rather than wholesaling, as would be the case with any other manufacturer that wholesales its products. In sum, although SIC Manual category 5148 generally covers establishments that are "primarily engaged in the

wholesale distribution of fresh fruits and vegetables," the commission reasonably concluded that Gagliano's wholesale activities did not mean that its facility necessarily fit category 5148.

¶ 37. In addition, it is not evident from the subcategories in SIC Manual category 5148 whether the ripening of produce other than bananas is included in category 5148. There is no dispute that the vast majority of Gagliano's ripening activities at its facility involves tomatoes, not bananas.[11] The four subcategories listed in SIC Manual category 5148 are (1) fruits generally, (2) vegetables generally, (3) potatoes specifically, and (4) banana ripening specifically. It is far from apparent why banana ripening was singled out from other fruits that undergo ripening between harvest and wholesaling. Gagliano suggests that the answer lies in testimony suggesting that banana ripening is unique in that, relative to other fruits, it involves comparatively little control.

¶ 38. The department asserts that there is no "supporting authority whatsoever" for the commission's determination that banana ripening in SIC Manual category 5148 appears to refer to passive ripening of bananas in storage, rather than to the sophisticated process Gagliano uses. However, given that the SIC

_____

[11] We do not read the department's argument to be that, even if Gagliano's tomato and other non-banana ripening is considered manufacturing under Wis. Stat. § 70.995, Gagliano's facility cannot be manufacturing property under § 70.995 unless Gagliano's banana ripening is also manufacturing under § 70.995. Rather, we understand the department's argument to be that none of Gagliano's ripening activities constitute manufacturing under § 70.995 and that, at least for the purposes of this case, the classification of Gagliano's facility is an all-or-nothing proposition.

Manual singles out banana ripening, and given the testimony that banana ripening is subject to comparatively less control, the commission could reasonably conclude that banana ripening in the SIC Manual contemplates a process different than that of Gagliano's sophisticated ripening chambers. Again, we need only test the commission's conclusion for reasonableness; we need not determine whether some other conclusion is more reasonable.

¶ 39. The department also points to testimony by its district office manager in which the manager stated that she contacted the government office that publishes the newest version of the SIC Manual (now called the North American Industrial Standard Classification Manual) and that she had been advised that ripening is considered in the new manual to fall under a nonmanufacturing category. However, as even the manager acknowledged, the Wisconsin legislature has adopted the 1987 SIC Manual, not a newer version of the manual. *See* Wis. Stat. § 70.995(2). The manager testified that "according to the law we are still mandated to use the 1987 SIC Code Manual." The department points to no authority suggesting that the legislature intended that the department, the commission, or the courts follow subsequently revised versions of the 1987 SIC Manual. We conclude that it is the 1987 SIC Manual that must be followed under § 70.995(2) until the legislature directs otherwise.

¶ 40. Thus, we disagree with the department's assertion that Gagliano's activities at its facility fit "squarely" into SIC Manual category 5148. The commission reasonably determined that they did not. Having concluded that Gagliano's activities did not fit squarely into a particular SIC Manual category, the commission

then reasonably looked to the general definition of manufacturing in the SIC Manual to assist it in classifying Gagliano's facility.

¶ 41. In a closely related argument, the department contends that the commission erroneously found as a matter of fact that Gagliano is not "primarily engaged in the wholesale distribution of fresh fruits and vegetables." To the extent this determination by the commission can be viewed as a finding of fact, it is supported by substantial evidence in the record. As a factual matter, the evidence supports a reasonable determination that Gagliano's "primary" activity, if Gagliano can be said to have any "primary" activity, is no more wholesale distribution than it is ripening. Gagliano's chief financial officer testified that only about 20% of Gagliano's business is "non-ripening." His testimony demonstrated that Gagliano ripens the vast majority of the produce that it sells. The department does not challenge a related commission determination, which is more plainly a finding of fact, that "Gagliano is primarily engaged in the purchasing, *ripening,* storage, and sale of fresh produce . . . ." (Emphasis added.)

¶ 42. The department next argues that the commission's analysis rested on a simplistic view of ripening as a chemical transformation that would not otherwise occur naturally. More specifically, the department challenges three of the commission's findings: (1) that green tomatoes, as harvested, have not experienced the physiological changes necessary to ripen; (2) that green tomatoes will not ripen properly unless exposed to ethylene gas, without which they would either rot or ripen in a non-uniform manner, making them unmarketable or minimally marketable; and (3) that traditional ripening rooms cannot be used

766

to manipulate and control the ripening process. We address each of these findings in turn.

¶ 43. *As harvested, "mature greens" have not experienced the physiological changes necessary to ripen.* The department challenges this finding by pointing to testimony indicating that there is no set point at which tomato ripening can be said to begin and that green tomatoes can ripen post-harvest even if left on a windowsill or table. At the same time, the department acknowledges other testimony asserting that mature greens have *not* "gone through the changes that need to happen in the tomato for ripening."

¶ 44. According to the department, the commission misunderstood the ripening process, or at least confused "ripening" as scientifically and generally understood with "ripening" as used in the produce industry. We disagree. A reasonable inference from the commission's findings is that the commission was using the term "ripen" in this finding to mean ripen in a sufficiently uniform manner to make the ripened produce profitably marketable.

¶ 45. *Once harvested, mature greens will only ripen properly if exposed to ethylene gas, without which they would either rot or ripen in a non-uniform manner, and would be unmarketable or minimally marketable.* The department acknowledges that there was evidence before the commission that, if Gagliano did not inject ethylene gas into its ripening rooms, some of Gagliano's produce would rot and some of it would ripen non-uniformly in poor condition and be unsaleable. Nonetheless, the department argues that the commission could not reasonably find from this evidence that all of Gagliano's produce would rot or ripen non-uniformly and, therefore, be unsaleable if ethylene gas were not injected into its ripening rooms. The department points

to the same expert testimony that it marshals in challenging the commission's finding that mature green tomatoes have not experienced the physiological changes necessary to ripen. For the same reasons we discussed in relation to that finding, we reject the department's challenge to this finding. The department overlooks a reasonable inference about what the commission meant by ripening "properly." The record supports the inference that the commission meant that the mature green tomatoes that Gagliano buys, *on the whole,* will only ripen properly—that is, in a way that makes substantially more tomatoes marketable—if exposed to ethylene gas in ripening chambers like Gagliano's.

¶ 46. *Traditional ripening rooms cannot be used to manipulate and control the ripening process.* The department points to testimony that traditional ripening rooms had a source of ethylene gas and a cooler. The overall gist of the evidence relevant to this finding, according to the department, is that newer ripening rooms like Gagliano's simply allow more control and are nothing but traditional ripening rooms with more bells and whistles.

¶ 47. We agree that the difference between traditional ripening rooms and Gagliano's sophisticated ripening chambers might be viewed as a difference of degree, not kind. But that comparison does not render the commission's decision unreasonable. The commission's findings, taken together, show that the commission correctly understood that Gagliano's ripening chambers are significantly more complex and allow far more precise manipulation of the ripening process when compared with traditional ripening rooms. A witness for Gagliano testified that traditional ripening rooms created "checkerboard" or "splotchy" ripening

and inhibited "the true ripening process." A reasonable interpretation of the commission's finding is that traditional ripening rooms could not ripen with precision comparable to that of Gagliano's ripening chambers. Even taking as true that green tomatoes generally are capable of ripening in some form on their own, the commission could still have reasonably determined that Gagliano's ripening activities were more like manufacturing than nonmanufacturing for purposes of the SIC Manual and WIS. STAT. § 70.995.[12]

¶ 48. The department seems to be relying on this syllogism: (1) traditional ripening-room activities are not manufacturing property under WIS. STAT. § 70.995, (2) Gagliano's ripening chambers are not significantly different than traditional ripening rooms and, therefore, (3) Gagliano's ripening-chamber activities are not manufacturing under § 70.995. However, regardless whether traditional ripening rooms are manufacturing property under the applicable standards, Gagliano's state-of-the-art ripening chambers employ significantly more technology and achieve far superior results when compared with traditional ripening rooms. Thus, the department's syllogism does not persuade us that the commission acted unreasonably.

¶ 49. We turn our attention to the commission's analysis of the second assessment manual question: "Is the activity more closely aligned with the general de-

---

[12] The department also challenges the following finding by the commission: "Gagliano purchases tomatoes from suppliers in Mexico, Holland, Israel, Spain, and the United States. Produce wholesalers who do not have sophisticated equipment comparable to Gagliano's generally do not purchase imported produce." The department, however, does not explain why the commission's conclusion is dependent on this finding. We decline to address this finding any further.

scription of producing, assembling, fabricating, making or milling by machinery and equipment of a new article with a different form, use and name from existing materials, or is it more aligned with the general activities involved with services as generally described in the SIC Manual, wholesale trade, retail trade, agriculture, or construction?" *Zip Sort*, 247 Wis. 2d 295, ¶ 9.

¶ 50. The department argues that ripening must be contrasted with what the department deems the "much more extensive transformations necessary" for produce-related activities that *are* expressly categorized as manufacturing by the SIC Manual. These categories include canning and dehydrating. *See* SIC Manual, at 72–73. The department asserts that a tomato is commonly known as a "tomato" whether it is green or ripe. The department thus takes issue with the reasonableness of the commission's application of the second assessment manual question to conclude that Gagliano's ripening activities

> produce (by applying ethylene gas and controlling temperature and humidity) by machinery (ripening chambers and related computers) a new article (edible, ripe produce) with a different form (for example, processing tomatoes from stone-hard, green, starchy tasting, earthy in aroma to ripened, edible, soft, juicy, orange or red, sweet tasting, pleasantly aromatic tomatoes), with a different use (edible and commercially saleable), and with a different name (ripened, edible produce) from existing materials (unripened tomatoes, ethylene gas, humidity, temperature).

The commission repeatedly asserts: a "tomato is a tomato."

¶ 51. In our view, the commission's parenthetical explanations go far in demonstrating that the commis-

sion reasonably applied the second assessment manual question. In any event, the department's arguments do not persuade us that the commission acted unreasonably.

¶ 52. Does dehydrating a tomato—which is apparently manufacturing under the SIC Manual—involve a greater chemical transformation than ripening a tomato? Does dehydrating a tomato necessarily involve more machinery or equipment than ripening a tomato? Could the commission have reasonably concluded that the transformation from green tomato to ripe red tomato cannot be manufacturing within the meaning of Wis. Stat. § 70.995 even though the transformation from ripe tomato to dehydrated tomato is? Is a dehydrated tomato not commonly known as a "tomato"? Is there a difference between green and ripe tomatoes greater than the difference between ripe tomatoes and dehydrated tomatoes? The answers to these questions are not obvious. This fact undercuts the assumptions made by the department.

¶ 53. The department argues that the commission's decision in this case is inconsistent with its decision in a case involving greenhouses, *Karthauser & Sons, Inc. v. DOR*, Wis. Tax Rep. 1986–1990 (CCH) ¶ 203–089 (Nos. 88–M–140 and 88–M–141) (Sept. 8, 1989). We disagree. In *Karthauser*, the commission upheld a department determination that a nursery's commercial greenhouses were not manufacturing property under Wis. Stat. § 70.995. The commission placed emphasis on the dictionary definition of "process," and concluded that "[n]othing in the meaning of 'process' implicates 'growing.' " *Karthauser*, Wis. Tax Rep. (CCH) ¶ 203–089 at 14,372. The commission explained: "Growing and processing are separate activities. Growing produces the agricultural product, but only the subsequent

771

'processing'—e.g. being frozen, canned, packaged, *prepared for market, etc.*—falls within 'manufacturing.' " *Id.* (emphasis added). Here, the commission could reasonably determine that Gagliano's sophisticated ripening activities are more akin to preparing produce for the market than to growing and, therefore, more akin to processing than growing.[13] Thus, contrary to the department's argument, the commission in this case could reasonably determine that Gagliano's ripening activities constitute manufacturing under the applicable standards, even if the activity of growing plants from seed in greenhouses ordinarily does not.

¶ 54. We conclude that the commission's application of the assessment manual questions to Gagliano's ripening chambers is reasonable. Consequently, the commission's conclusion that Gagliano's facility is manufacturing property under Wis. Stat. § 70.995 is reasonable. As we said at the outset, this case presents

---

[13] We note that the greenhouse activities in *Karthauser & Sons, Inc. v. DOR*, Wis. Tax Rep. 1986–1990 (CCH) ¶ 203–089 (Nos. 88–M-140 and 88–M-141) (Sept. 8, 1989), also appear to fit squarely in a nonmanufacturing SIC Manual category. The greenhouses in *Karthauser* were used to "raise[] flowering potted plants and bedding plants." *Id.* at 14,370. SIC Manual category 0181, under "Agriculture, Forestry, and Fishing," is described as:

> Establishments primarily engaged in the production of ornamental plants and other nursery products, such as bulbs, florists' greens, flowers, shrubbery, flower and vegetable seeds and plants, and sod. These products may be grown under cover (greenhouse, frame, cloth house, lath house) or outdoors.

SIC Manual, at 21, 26. More to the point, this category includes subcategories of "Bedding plants, growing of" and "Plants, potted: growing of." *Id.*, at 26.

a close question, but we are limited to deciding whether the commission's conclusion in applying the statute was reasonable, even if a different conclusion is more reasonable. *See Zip Sort*, 247 Wis. 2d 295, ¶ 12.[14]

## Conclusion

¶ 55. We have determined that great weight deference applies to the commission's conclusion that Gagliano's facility is manufacturing property under Wis. Stat. § 70.995. In addition, we have determined that the commission's conclusion was reasonable. We have also rejected the department's assertion that the commission's decision depended on erroneous findings of fact. Accordingly, we reverse the circuit court's order, thereby reinstating the commission's decision.

*By the Court.*—Order reversed.

[14] We do not address what weight, if any, should be given to a 1999 department memorandum in which the department determined that Gagliano's ripening chambers could qualify for a sales and use tax exemption as machines or equipment "used by a manufacturer in manufacturing" under Wis. Stat. § 77.54(6)(a) and (6m). The commission, though it cited this memorandum in its decision, ultimately concluded that its decision here "stands alone" from the department's sales and use tax memorandum.