COURT OF APPEALS
DECISION
DATED AND FILED

December 2, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      **2020AP2085**

**STATE OF WISCONSIN**

Cir. Ct. No.  2019CV3502

**IN COURT OF APPEALS
DISTRICT IV**

J. T. BY HIS GUARDIAN R. T.,

    PETITIONERS-APPELLANTS,

  V.

WISCONSIN DEPARTMENT OF HEALTH SERVICES,

    RESPONDENT-RESPONDENT.

          APPEAL from an order of the circuit court for Dane County: STEPHEN E. EHLKE, Judge. *Affirmed*.

          Before Blanchard, P.J., Kloppenburg, and Graham, JJ.

          **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. § 809.23(3).**

¶1	PER CURIAM.	Before September 2019, J.T. received behavioral health services from a therapy provider for J.T.'s disorder on the autism spectrum. Through his guardian, J.T. appeals a circuit court order that affirmed a decision of the Wisconsin Department of Health Services (the Department) following a contested case hearing. The challenged agency decision is the Department's denial of a request by the therapy provider for an extension of Medicaid funding to cover therapy beyond August 31, 2019.[1] The Department based its denial on the determination that the provider had not produced sufficient information in response to demands by the Department regarding specific types of progress that J.T. has made as a result of therapy by the provider and skills-instruction by his parents. We affirm for the following reasons.

¶2	First, J.T. contends that the circuit court should have reversed the challenged Department decision based on WIS. STAT. § 227.57(8) ("The court shall reverse … if it finds that the agency's exercise of discretion … is inconsistent with … an officially stated agency policy …, if deviation therefrom is not explained to the satisfaction of the court by the agency."). J.T. argues that the Department's demands for information supporting the provider's request for continued authorization, and its ultimate denial based on a lack of information, require reversal because the demands and denial were inconsistent with an

---

[1] More precisely, the decision challenged by J.T. and his guardian (collectively, J.T.) was issued by an administrative law judge (ALJ) with the state Division of Hearings and Appeals, who reviewed Department actions challenged by J.T. An ALJ decision in this context is treated as a final decision of the Department, subject to potential judicial review. *See* WIS. STAT. §§ 227.43(1)(bu), 227.52, 227.53; WIS. ADMIN. CODE § HA 3.09(9)(a) (Oct. 2021).

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted. All references to the Wisconsin Administrative Code § DHS are to the October 2021 Register unless otherwise noted.

officially stated policy of the Department, and because the Department fails to provide a satisfactory explanation for this alleged deviation. We assume without deciding that the Department's challenged conduct deviated from an officially stated policy of the Department. With that assumption, we reject J.T.'s argument that the Department has not provided a satisfactory explanation for the assumed deviation.

¶3      Second, J.T. contends that the Department's denial decision was not based on substantial evidence. We conclude that, taking into account all relevant evidence in the record, reasonable minds could come to the same conclusion as the Department and, therefore, substantial evidence supports its denial decision.

## BACKGROUND

¶4      The ALJ issued the challenged order following a contested case hearing. The following summary is primarily derived from the ALJ's decision.[2]

¶5      J.T. was 18 as of the time of the ALJ's decision in November 2019. He has a disorder on the autism spectrum. Since 2009, he had been receiving "applied behavioral analysis" therapy through a service provider, a clinician that we refer to as "the provider." There is no dispute that therapy of the type that J.T. has received from the provider can be covered under medical assistance for

---

[2] The ALJ nominally divided his decision into a set of "findings of fact," a "discussion," and a "conclusion," but the discussion section includes some findings of fact that are not included among the denominated "findings of fact." Construing the decision as a whole, we disregard the section headings in the ALJ's decision and consider the substance of all evident findings of fact. We reject as unsupported any argument that J.T. may intend to make to the effect that we must ignore findings of the ALJ that are contained in his decision that are not explicitly denominated as a "finding of fact."

persons under 21, with the goal of correcting or ameliorating conditions that can include autism spectrum disorders. *See* WIS. ADMIN. CODE § DHS 107.22.

¶6 Since 2016, this provider treatment had been funded through medical assistance (Medicaid administered through the Department) based on authorizations by the Department.[3] Over time, the Department granted, with respect to J.T., what are referred to as "prior authorization amendment requests"—that is, requests for extensions of funding for treatment services for designated periods of time. For ease of reference we refer to these as "the requests for continued authorization" or "the requests."

¶7 Since April 2016, a Department "team," consisting of "three behavior analysts, a developmental psychologist," and a "licensed behavior analyst," "scrutin[ized]" the requests. The Department granted periodic requests over the years. However, based on "concern[]" by team members "about the length of treatment" that had been provided for J.T.—"in particular how the skills learned through treatment are being carried over to [J.T.'s] home"—the team made "increasing calls for more information" regarding his "progress and carryover."

¶8 The provider made its most recent request to the Department for continued authorization in February 2019. The Department approved the request, but for treatment lasting only until June 30, 2019. The Department's position was that the information provided to date reflected that J.T. "has acquired and generalized only twelve skills over the past seven years." The Department asked

---

[3] *See* the Medicaid Act, Title subch. XIX of the Social Security Act, 42 U.S.C. § 1396; WIS. STAT. § 49.45 ("Medical assistance; administration").

4

the provider for "data concerning maintenance and generalization of skills to environments outside therapy" in "a comprehensive summary of [J.T.'s] progress in treatment, including [information regarding] carryover [of learned skills] to his home and family." The Department's team asked for this information in part so that it could address concerns "about whether [J.T.'s] gains [had] been garnered from the treatment or [instead from J.T.'s] natural maturation process." As the Department explained, its team was "concerned that the family has essentially diverted [J.T.] to the provider with little input or effort by the parents to help [J.T.] learn skills and carry them over." The team described "the information sought regarding [J.T. as being] an industry norm."

¶9 In June 2019, the provider requested continued authorization that would extend beyond the end of that month. The Department granted an extension to August 31, 2019. But in doing so, the Department took the position that it would not approve funding for continued services beyond that date until "the provider submitted data showing skills taught by the [provider] and mastered by [J.T.], as well as skills taught [to J.T.] by [J.T.'s] parents and skills taught to the parents to assist [in J.T.'s] progress."

¶10 In August 2019, the provider asked the Department to approve "another extension to run through the end of the year." The Department "returned the request[,] demanding that the information noted in June [2019] be provided. When it was not provided to the team's satisfaction," the request "was denied on September 23, 2019."

¶11 The Department and the provider had been "working on a resolution" to this dispute over information "for years, and the attempts have

intensified since the beginning of 2019," with the Department "approv[ing] continued services despite the lack of response from" the provider.

¶12    The ALJ found that the Department's demands for information "are [now] too difficult only because [the provider] has made little effort over the years to comply with them," and for this reason the Department had the authority to deny the most recent request. Since 2016, the provider "has chosen to ignore the request" from the Department to compile a list of skills taught. This concerned the team because "[a]t the rate skills are being learned by [J.T.] the services could continue for years, which calls into question the services' appropriateness." "It appears that the [provider's] plan is simply to continue to work on teaching small tasks [to J.T.] indefinitely."

¶13    The ALJ concluded that the Department in its September 2019 determination had "correctly denied" J.T.'s request for continued authorization that would continue past August 31, 2019, on the ground that the provider had failed to comply with the Department's requirement that the provider produce more information regarding J.T.'s progress in treatment.

¶14    J.T. petitioned the circuit court for judicial review of the Department's decision. In October 2020, the circuit court affirmed on the ground that J.T. "failed to show that [the Department] acted without authority or erroneously interpreted the law." J.T. appeals.

## DISCUSSION

¶15    J.T. offers many critiques of the Department's demands for information and its denial of the request for continued authorization, but we discern only two categories of developed arguments based on the correct legal

standards. As stated in ¶¶2-3 *supra*, J.T. argues that the Department's decision deviated from Department policy without a satisfactory explanation and was not based on substantial evidence. Generally pertinent to each of these developed arguments are the following legal standards (with additional legal standards specific to each issue referenced below):

> "When an appeal is taken from a circuit court order reviewing an agency decision, we review the decision of the agency, not the circuit court." We review questions of agency authority de novo.
>
> This case also requires us to interpret several statutory provisions, which we review de novo. The purpose of statutory interpretation is to "determine what the statute means so that it may be given its full, proper, and intended effect."

*Clean Wis., Inc. v. DNR*, 2021 WI 71, ¶¶14-15, 398 Wis. 2d 386, 961 N.W.2d 346 (citations omitted). We also interpret case law, a task that presents issue of law that are reviewed de novo. *See State v. Walker*, 2008 WI 34, ¶13, 308 Wis. 2d 666, 747 N.W.2d 673.

¶16 Agency findings of historical fact are upheld if there is evidence on which reasonable persons could rely to make that determination. *See Milwaukee Symphony Orchestra, Inc. v. DNR*, 2010 WI 33, ¶31, 324 Wis. 2d 68, 781 N.W.2d 674. Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla and cannot consist of mere conjecture and speculation. *Oneida Seven Generations Corp. v. City of Green Bay*, 2015 WI 50, ¶44, 362 Wis. 2d 290, 865 N.W.2d 162.

## I. DEVIATION FROM POLICY

¶17 J.T.'s deviation-from-policy argument based on WIS. STAT. § 227.57(8) is that the Department's decision must be reversed because its

challenged conduct—its demands for information and denial of the August 2019 request based on a lack of sufficient information—was "inconsistent" with "officially stated" "policy" of the Department and that the Department has not "explained" this alleged "deviation" "to the satisfaction of the court." We now describe the argument in more detail, state the assumptions that we make for purposes of resolving this appeal, and then explain how the argument fails under the pertinent legal standards even when we make these assumptions in J.T.'s favor. To summarize, given the Department's statutory and regulatory obligation to investigate medical necessity and the appropriateness of proposed clinical treatment in this context, it had a rational basis in this case to demand the information that it demanded in order to allow it to evaluate potential alternatives and conduct cost-effectiveness analysis. Further, the Department had a rational basis to deny the request when the provider failed to produce information that the Department deemed it needed in order to determine whether particular skills could be taught by the parents, by a personal care worker, or through other support that would be less costly than the particular treatment that would continue to be offered by the provider.

### A. Additional Background

¶18 J.T.'s deviation-from-policy argument involves a reference contained in one portion of a handbook that the Department publicly issued.[4] The handbook portion is labeled "Topic #19039" and is entitled "Approval Criteria for

---

[4] As context we note that, pursuant to WIS. ADMIN. CODE § DHS 108.02(4), the Department "shall publish provider handbooks, bulletins and periodic updates to inform providers of changes in state or federal law, policy, reimbursement rates and formulas, departmental interpretation, and procedural directives such as billing and prior authorization procedures, specific reimbursement changes and items of general information."

Prior Authorization Amendment Requests." We refer to this as "handbook topic 19039." In particular, J.T. highlights the phrase that we now emphasize in the following paragraph of handbook topic 19039:

> [Requests for continued authorization] must include a summary of the member's progress, or lack of progress, *since treatment was last authorized*. The summary should include both narrative descriptions of behavior as well as measurements of current behavior compared to behavior at the beginning of the authorization period. Charts or data summaries of measurable results are acceptable. When standardized or other formal testing is included as part of a progress summary, include prior and current test results for comparison purposes.[5]

J.T. points out that his treatment was "last authorized" beginning on January 1, 2019, and takes the position that the provider met this standard "by including a detailed progress summary for the period of January to June 2019." J.T. contends that the Department went beyond the scope and nature of the information described in handbook topic 19039 when the Department demanded twice in June 2019 and again in August 2019 that the provider had to produce the following information:

---

[5] J.T. primarily, and at times exclusively, focuses his deviation-from-policy argument on the phrase we emphasize in this passage of handbook topic 19039: "since treatment was last authorized." At one point he calls our attention to the following additional passage in handbook topic 19039, but he does not develop an additional argument for reversal of the Department decision based on this passage:

> The provider is required to demonstrate that the member has mastered new skills and, therefore, has advanced or improved in function as a result of treatment intervention. Progress must be documented in specific, measurable, objective terms. Progress that is indicated by descriptive terms, such as "better," "improved," "calmer," "less/more," or "longer" are not measurable and will not be accepted by [the Department].

In the absence of a developed argument based on this passage we do not consider it further.

9

1.  A list of all skills that have been directly taught by a clinician and mastered by [J.T.], including introduction and mastery dates[,]

2.  A list of all mastered skills listed above that have been successfully generalized to the family, including dates of generalization,

3.  A list of all skills that have not yet been mastered, but directly taught by a clinician, including introduction dates[,]

4.  A list of skills that have been directly taught by the parents to [J.T.], [including an] indication of which have been mastered, with introduction and mastery dates[, and]

5.  Parent training goals that have been introduced to [J.T.'s] family, including introduction and mastery dates.

J.T. characterizes these as "sweeping" demands that required "highly detailed progress information" and argues that they constituted both "temporal overreach" and "substantive overreach" compared with what is described in handbook topic 19039 as necessary to support requests for continued authorization.

¶19    J.T. argues that the Department's information demands and denial of the August 2019 request based on insufficient information were, to use the terms of Wis. Stat. § 227.57(8), "inconsistent with" handbook topic 19039, which is "an officially stated" "policy" of the Department, and that this alleged "deviation" from a department "policy" has not been "explained to the satisfaction of the court by" the Department.

¶20    The Department offers multiple arguments challenging the premise that the Department's demands resulting in its denial of the August 2019 request for continued authorization were "inconsistent with" handbook topic 19039, particularly when interpreted along with additional, related topics addressed in

other portions of the same handbook. More broadly and in the alternative, the Department argues that any inconsistency could not matter because the Department's conduct was authorized under pertinent statutes and administrative rules. However, we need address only one Department argument on this issue because we conclude that it is correct and dispositive.[6] We now explain assumptions that we make in addressing the Department's argument.

### B. Assumptions In J.T.'s favor

¶21 We assume that the Department's challenged conduct was inconsistent with handbook topic 19039 specifically, and also with the handbook more generally, and that the handbook was "an officially stated" "policy" of the Department. In particular, we assume that handbook topic 19039 officially sets the temporal range of information that the Department can request, by limiting it to the time period beginning with the last authorization of treatment. To be clear, however, we do not assume that J.T.'s interpretation of the handbook is consistent with the Department's obligations under pertinent statutes and regulations summarized below.[7]

---

[6] For these same reasons, we do not address the Department's argument that J.T. fails to develop an argument contrary to the Department's assertion that pertinent statutes and administrative rules authorized all of the Department's challenged actions, regardless of the content of the handbook.

[7] With these assumptions, we do not address any reference J.T. makes in his briefing that we construe to relate to his argument that the Department's information demands were inconsistent with handbook topic 19039. This includes his assertions that "limitations on its coverage" for the behavioral treatment at issue are not defined in statutes or regulations and that the handbook itself contains provisions of "questionable legality" in light of the enactment of WIS. STAT. §§ 227.10(2m) and 227.112, as well as his argument that it was an erroneous interpretation of law for the ALJ not to take into account the phrase "since treatment was last authorized" in handbook topic 19039. It also includes his extended summary of evidence about progress he has made that he submits shows that he demonstrated to the ALJ that he met the only

(continued)

¶22 With these assumptions, what remains on this issue is whether the Department has explained the assumed "deviation" "to the satisfaction of the court." *See* WIS. STAT. § 227.57(8). We agree with the Department that, given fact finding by the ALJ that J.T. fails to show is not supported by substantial evidence, the Department has provided a satisfactory explanation that the assumed deviation had a rational basis in the statutory and regulatory mandate that the Department evaluate "medical necessity and appropriateness" of requests for continued Department authorization in this context. We now turn to the legal standards on this topic.

### C.     Legal Standards

¶23 As our supreme court has observed on at least two occasions, the statute now numbered WIS. STAT. § 227.57(8) provides a standard of review that is "unusual" for the administrative law context, because it leaves all applications of § 227.57(8) exclusively to the courts. *See **Arrowhead United Teachers Org. v. WERC**,* 116 Wis. 2d 580, 589, 342 N.W.2d 709 (1984) (citing ***Wisconsin Assoc. of Mfrs. & Com. v. PSC***, 100 Wis. 2d 300, 305, 301 N.W.2d 247 (1981)).[8] Under this unusual standard, "[*t*]*he court* shall reverse … if [*the court*] *finds* that the

---

information demands that the Department was allowed to make pursuant to handbook topic 19039.

[8] WISCONSIN STAT. § 227.57(8) has been renumbered from its previous designation as WIS. STAT. § 227.20(8) at the times it was interpreted in ***Arrowhead United Teachers Org. v. WERC***, 116 Wis. 2d 580, 342 N.W.2d 709 (1984), and ***Wisconsin Public Service Corp. v. PSC***, 109 Wis. 2d 256, 325 N.W.2d 867 (1982). But the wording has remained identical since at least the 1979-80 revised statutes that were interpreted in ***Public Service Corp.*** *Compare* § 227.57 *with **Arrowhead**,* 116 Wis. 2d at 588, *and **Public Serv. Corp.**,* 109 Wis. 2d at 263. For ease of reference, we use the current statute number, even when applying the reasoning in ***Arrowhead*** and ***Public Service Corp.***

12

agency's exercise of discretion … is inconsistent with … an officially stated agency policy …, if deviation therefrom *is not explained to the satisfaction of the court by the agency*." Sec. 227.57(8) (emphasis added).

¶24　Past applications of WIS. STAT. § 227.57(8) by our supreme court make clear that an appellate court is to consider independently whether the agency's explanation of a deviation is satisfactory, without regard to any determination on this topic by the agency or the circuit court. *See, e.g.*, ***Wisconsin Public Serv. Corp. v. PSC***, 109 Wis. 2d 256, 263, 325 N.W.2d 867 (1982) (stating that the "court of appeals found [that an alleged] deviation [was] adequately explained" by the agency and stating "[w]e" "find the reasons given by [the agency] to be without substance or convincing power.").

¶25　We turn to the standard for determining whether a "deviation" has been "explained to the satisfaction of the court by the agency." An explanation is not satisfactory if "'the deviation is so unreasonable as to be *without a rational basis* or the result of an unconsidered, willful and irrational choice of conduct,'" such that it amounts to an "'arbitrary and capricious'" action. *See **Arrowhead**,* 116 Wis. 2d at 589 (quoting ***Public Serv. Corp.***, 109 Wis. 2d at 263) (emphasis added in ***Arrowhead***); *see also **Mata v. DCF***, 2014 WI App 69, ¶¶23-25, 354 Wis. 2d 486, 849 N.W.2d 908 (agency required to provide only a "'satisfactory explanation'" to deviate from prior agency policy) (quoting ***Stoughton Trailers, Inc. v. LIRC***, 2006 WI App 157, ¶27, 295 Wis. 2d 750, 721 N.W.2d 102). Thus, our supreme court has interpreted the broadly stated phrase "explained to the

satisfaction of the court by the agency" as requiring the agency to demonstrate as a matter of law that a deviation merely had some rational basis.[9]

¶26 While J.T. does not present the following as an explicit argument, at times he seems to suggest the view that "explained to the satisfaction of the court by the agency" in WIS. STAT. § 227.57(8) means that the agency must have provided at least one explicit explanation for the deviation *to the aggrieved party at the time of deviation*, and that later review by the court is limited to only such explicit, previously given explanations. If J.T. intends to take this position, we reject it as contrary to a plain meaning interpretation of § 227.57(8) and the reasoning in the case law we have just cited. The issue in this appeal is whether the Department has provided to this court a rational basis for the assumed deviation.

---

[9] There is one difference between the context here and a shared context in *Arrowhead* and *Public Service Corp.* Those cases each involved an alleged "prior agency practice" and not (as here) an alleged "officially stated agency policy." Thus, those cases involved a different aspect of the phrase "is inconsistent with an agency rule, an officially stated agency policy or a prior agency practice" in WIS. STAT. § 227.57(8). *See Arrowhead*, 116 Wis. 2d at 586-89; *Public Serv. Corp.*, 109 Wis. 2d at 263-64. However, nothing in the text of § 227.57(8) suggests that courts should regard deviations from "officially stated agency policy" differently from deviations from "prior agency practice"—both must be "explained to the satisfaction of the court." Additionally, in *Public Service Corp.*, on which *Arrowhead* directly relies, the court appears to broadly equate all challenges to an administrative action based on § 227.57(8) to claims that an administrative action was "arbitrary and capricious," all of which must be denied if the court determines that the agency acted "on a rational basis." *See Arrowhead*, 116 Wis. 2d at 589; *Public Serv. Corp.*, 109 Wis. 2d at 263 (citing *Robertson Transp. Co. v. PSC*, 39 Wis. 2d 653, 661, 159 N.W.2d 636 (1968) (addressing an alleged inconsistency in agency practices as presenting the issue of whether the agency acted arbitrarily and capriciously)). Based on our interpretation of the case law that we have just summarized in the text, we discern no reason, and J.T. provides us with no reason, to think that this standard must be modified to be less deferential to an administrative action that is inconsistent with "officially stated agency policy" than to an action that is inconsistent with "prior agency practice."

### D.      Analysis

¶27     On de novo review and with the stated assumption, we conclude that the Department has demonstrated that the assumed deviation from its policy had a rational basis and we reject J.T.'s deviation-from-policy argument on that ground.

¶28     As the Department now argues, and J.T. does not dispute, pertinent statutes and regulations create a regulatory regime under which the Department is obligated to evaluate the medical necessity and appropriateness of each request for continued authorization.  This requires the Department to obtain a reasonably complete understanding of pertinent treatment history and progress for the person who would be the subject of the therapy.  Apart from the brief summary below, we need not convey the extensive statutory and regulatory citations provided by the Department in its briefing, because in his reply brief J.T. concedes the substance of those citations and their general applicability here.  He explains that his argument instead rests entirely on alleged inconsistencies between handbook topic 19039, on the one hand, and the information demands and final denial of the Department, on the other hand.  Putting aside the inconsistency issue that we assume in his favor, J.T. does not suggest that the ALJ "erroneously interpreted a provision of law and a correct interpretation compels a particular action," *see* WIS. STAT. § 227.57(5), nor does he dispute that the particular administrative code provisions cited by the Department have the force of law, *see* ***Gister v. American Family Mutual Insurance Co.***, 2012 WI 86, ¶35, 342 Wis. 2d 496, 818 N.W.2d 880 ("'When an administrative agency promulgates regulations pursuant to a power delegated by the legislature, we construe those regulations together with the statute to make, if possible, an effectual piece of legislation in harmony with common sense and sound reason.'" (quoted source omitted)).

15

¶29    For the sake of completeness, we now briefly summarize applicable law.    The Department describes how it has, pursuant to statutory directive, promulgated pertinent rules for administering the medical assistance program in WIS. ADMIN. CODE chs. DHS 101-109.  Especially pertinent here are WIS. ADMIN. CODE § DHS 106.02(5), which states that "[a] provider shall be reimbursed only for services that are appropriate and medically necessary for the condition of the recipient," and WIS. ADMIN. CODE § DHS 107.02(3)(b)1., 5., which requires the Department to consider factors that include the need to "safeguard against unnecessary or inappropriate care and services" and "[t]o promote the most effective and appropriate use of available services and facilities."  *See also* WIS. STAT. § 49.45(3)(f)2m. ("the department shall deny any provider claim for services that fail to meet criteria the department may establish concerning medical necessity or appropriateness"); WIS. STAT. § 49.46(2)(a)2. (the Department "shall audit and pay allowable charges" for "[e]arly and periodic screening and diagnosis, including case management services, of persons under 21 years of age and all medical treatment … found necessary by this screening and diagnosis").  Notably, the administrative code establishes that "covered services" are "reimbursable provided" that the "request and supporting information, … *completely* and accurately reveals *all facts pertinent to* the recipient's case and to the review process and criteria provided under s. DHS 107.02(3)."  Sec. DHS 107.02(3)(i)2.b. (emphasis added).

¶30    We conclude that this statutory and administrative code background that J.T. does not dispute applies here provides a rational basis for the assumed deviation by the Department under material facts found by the ALJ.  Given the context of the Department's statutory and regulatory obligation to investigate medical necessity and appropriateness of proposed clinical treatment—and the

extensive evidence here that the Department team needed the missing information in order to determine whether particular skills could be taught by the parents, by a personal care worker, or through other support that would be less costly and restrictive than the particular treatment that would continue to be offered by the provider—the Department had a rational basis to demand the information and deny the request in the absence of the missing information.

¶31    We are able to identify two arguments by J.T. that could be construed to the effect that there was no rational basis for the Department's assumed deviation.  First, J.T. may intend to argue that the Department had no rational basis to require the provider to fulfill the following information demand, which is number 4 on the list quoted at ¶18, *supra*:  "A list of skills that have been directly taught by the parents to [J.T.], [including] indication[s] of which have been mastered, with introduction and mastery dates."  We call this "the parent information demand."  Second, J.T. may intend to argue that the Department had no rational basis to demand information for the period 2006-2009 because the provider here was not providing therapy to J.T. at that time.  We call this "the 06-09 information demand."

¶32    Before describing J.T.'s both of demand-driven arguments in more detail, we note that they miss the mark because none of the following potential issues on which they seem to be based are in play in this appeal:  whether the Department has made the same information demands of providers in other cases; whether the demands were difficult to comply with; whether the Department could have accomplished the same authorized-by-law goals with narrower demands; or whether the Department and the provider could have successfully negotiated a mutually satisfactory compromise of the Department's demands.  Instead, the issue is whether the demands, and the ultimate denial of the request based on

insufficient responses to the demands, lacked a rational basis under the facts found by the ALJ and the pertinent statutes and administrative rules. As we now explain, the demands did not lack a rational basis, including the two categories of demands that J.T. could be construed to argue were irrational.

¶33 Regarding the parent information demand, J.T. argues that this was "just absurd" and "demanded the impossible" from the provider and the parents, because the parents are not "board certified behavior analysts," "superparents," or "mental health, developmental disability, or autism treatment professional[s]." J.T. could be construed to argue that it was irrational for the Department to expect that the parents, as of the time of the demand, could create a retrospective history of J.T.'s skills development, as if they had engaged, as J.T. now puts it, in "ongoing anthropological observation of their son's development" from his earliest years. J.T. refers to the parent information demand as a "poison pill" for the provider, suggesting that the Department team crafted this demand solely for the purpose of erecting a hurdle too high for the provider and the parents to clear.

¶34 The parent information demand was far-reaching in that it required the parents to reflect on and collect, and then reduce to summary form, information regarding their direct attempts to teach skills to J.T. over the course of his life. At the same time, however, it was limited to "mastered" skills that the parents "directly" taught J.T. Further, at least on its face it did not require the parents to use technical language to describe the skills or their mastery. In addition, it did not appear to preclude estimates for the dates of introduction and mastery.

¶35 J.T. suggests that the parents could not have produced this information from "data at hand," but he does not explain why we should conclude

that the Department should have known that the parents lacked relevant "data at hand." As the Department points out, at the hearing before the ALJ, J.T.'s mother testified to a degree about J.T.'s skill accomplishments at home, suggesting the ability to commit these to a list. Further, as J.T. acknowledges, the Department made the parent information demand repeatedly over time. J.T. provides no reason to conclude that the parents did not have an extended period over which they could have conferred with each other at length and consulted other sources of relevant information to refresh their memories, such as calendars and other persons who might have relevant information. Notably missing from J.T.'s arguments is any dispute that the parent information demand was not rationally related to the Department's legally required medical necessity and appropriateness investigation.

¶36 Turning to the "the 06-09 information demand," J.T. makes an unsourced assertion that the provider here "would not even have access to the data necessary to comply with the demand," suggesting an irrational demand for the impossible. We reject this particular potential rational-basis argument as undeveloped. J.T. does not point to evidence in the record establishing that the provider, with sufficient efforts at planning and communications with others, could not have taken steps adequate to obtain this information. And, again, J.T. does not dispute that the 06-09 information was rationally related to the Department's legally required medical necessity and appropriateness investigation.

¶37 Also relevant to the Department's explanation of a rational basis are findings by the ALJ that J.T. fails to show were not supported by substantial evidence, as discussed more fully in the following section of this opinion addressing substantial evidence. Relevant findings by the ALJ include the following. The Department demanded information that constituted "an industry

19

norm." The Department had attempted "since early 2016" to obtain the information demanded, but as late as August 2019 the Department did not have that information because the provider "made little effort over the years to comply with" information demands. And, the Department needed the demanded information in order to undertake the cost-effectiveness analysis required by the administrative rules for the purpose of discerning whether particular skills could be taught by the parents, by a personal care worker, or through other support that would be less costly than the particular treatment offered by the provider.

## II. SUBSTANTIAL EVIDENCE

¶38 J.T. argues that the Department's denial of the request was not supported by substantial evidence. We reject J.T.'s argument under the applicable legal standard.

¶39 As we have already noted, when reviewing findings of fact made by an administrative agency, we apply the "substantial evidence" standard. *See Hilton ex rel. Pages Homeowners' Ass'n v. DNR*, 2006 WI 84, ¶16, 293 Wis. 2d 1, 717 N.W.2d 166; WIS. STAT. § 227.57(6) ("[T]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact," unless it is "not supported by substantial evidence in the record."). Under this standard, the reviewing court determines whether, after considering all the evidence in the record, reasonable minds could arrive at the same conclusion and, if so, we affirm the agency's findings. *Hilton*, 293 Wis. 2d 1, ¶16.

¶40 J.T. makes a series of arguments challenging as factually unsupported what he characterizes as "the ALJ's conclusions regarding the relationship between the provider and [the Department]." J.T.'s "relationship" argument emphasizes pieces of evidence in the record that could support the

following potential findings: that the provider made "good faith attempts" at communication with the Department; that the provider did not literally "ignore" the substance of demands for information from the Department; and that at times the provider invited dialog with the Department that the Department may have failed to take advantage of. J.T. also invites us to interpret pieces of evidence as justifying what he submits was a conclusion by the provider during the summer of 2019 that further efforts to produce information to the Department would have been "futile" because the Department had shown that its "mind was made up" to deny the request for extension. Further, he argues that the ALJ should have found that J.T. had mastered at least 24 skills by 2018 and not that he had mastered only 12 since 2012, based on a letter that counsel for J.T. submitted to the Department in May 2019.

¶41 We conclude that, at best, J.T.'s "relationship" argument identifies evidence that could have supported different factual findings than those made by the ALJ, *see DOR v. A. Gagliano Co., Inc.*, 2005 WI App 170, ¶32, 284 Wis. 2d 741, 702 N.W.2d 834 ("[I]f the evidence supports more than one reasonable inference, the agency's inference is conclusive"), or else evidence that might have required different specific findings that are not especially significant to the challenged decision in light of other findings, *see Hilton*, 293 Wis. 2d 1, ¶16 (substantial evidence is not a preponderance of the evidence, but instead enough that reasonable minds could reach the same conclusion based on all evidence).

¶42 J.T. asks us to place significant weight on the fact that the Department, before the final denial that he now challenges, repeatedly approved prior requests for extension. He contends that these prior approvals show that the provider historically "answered" the Department's "questions" to the Department's "satisfaction." However, J.T. fails to explain why we should

conclude that the fact that the Department gave the prior approvals cannot be reconciled with the following representations by the Department in testimony and documentary evidence presented to the ALJ, which stand as substantial evidence to support the ALJ's key findings:

- The provider failed to provide the Department with information establishing "long-term or short-term benefits of their proposed treatment," specifically showing how the requested treatment would be "guided by parental involvement" aimed at giving J.T.'s family the skills needed to "eventually assume teaching and maintenance responsibilities."

- The Department had been "unable to establish if [J.T.'s] parents had gained the skills necessary for teaching and maintenance responsibility, or if the skills [J.T.] had acquired in therapy had in fact generalized to other settings."

- The Department could not "identify if the services that are being provided to [J.T.] are medically necessary" or determine whether the skills at issue "could not be taught by his parents, by a personal care worker or other support that is less costly and less restrictive than ... the focused treatment," "per Wisconsin Administrative Code for Medical Necessity."

- J.T. was taking "quite a bit of time" to master goals and the provider had not identified why J.T. "would need that much time."

- The Department needed more information about "the entire picture" to evaluate medical necessity for the purpose of determining whether the cost, quality, and quantity of treatment hours requested were justified.

We conclude that, considering all the evidence, reasonable minds could arrive at the same material conclusions as the ALJ. There was substantial evidence for the findings that, by at least the summer of 2019, the Department had repeatedly sought "a comprehensive summary" of information to allow it to understand better what J.T.'s rate of progress was and how the provider was helping the family to learn to maintain, generalize, and teach skills to J.T. This same evidence could

support the finding that, also by summer 2019, the provider failed to take sufficient steps to provide such a comprehensive summary demonstrating the "medical value or usefulness" of extending "cost-effective," "not duplicative" coverage for treatment that is "not solely for the convenience of the recipient, the recipient's family or a provider." *See* WIS. ADMIN. CODE § DHS 101.03(96m). This evidence included testimony that, between the provider and J.T.'s counsel, the Department received information only from 2018 and the first six months of 2019. Again, J.T. does not dispute that the administrative code requires the Department to obtain complete information necessary for "[j]ustification for the provision of service." WIS. ADMIN. CODE § DHS 107.02(3)(d)6. The information demands did not on their face require perfect responses from the provider and there was substantial evidence that the provider fell far short of providing the information requested.

¶43 Although unclear, J.T. may mean to suggest that the Department team that scrutinized the request at issue was not "qualified" to make the information demands that it made, but he fails to back that up with citations to evidence that the ALJ was obligated to credit. In a similar vein, J.T. asserts without sufficient evidence that the ALJ "entirely misunderstood what behavioral treatment is and how it is implemented," and "just doesn't want [the Department] to be bothered with the possibility of having to … entertain a future hearing request."

¶44 At several points, J.T. makes what amounts to a policy argument. He contends that, if the ALJ's decision here is affirmed, then in situations resembling this one—in which the Department will not, in J.T.'s words, "moderat[e]" information demands initially resisted by providers—the providers will be subjected to "crushing," "uncompensated" demands that will "impose a

23

massive regulatory burden." Under our standard of review, we are not permitted to address the potential merits or shortcomings of this policy argument. We cannot exercise the discretionary authority of the Department to investigate medical necessity and appropriateness of proposed clinical treatment in this context nor alter the scope of broad authority that the legislature has delegated to the Department.

## CONCLUSION

¶45 For all of these reasons, we affirm the circuit court's order affirming the ALJ decision, which represents the final decision of the Department.

*By the Court*.—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.